892 P.2d 838

**STATE of Arizona, Appellee,**

v.

**Ernest Valencia GONZALES, Appellant.**

**No. CR–92–0154–AP.**

Supreme Court of Arizona,
En Banc.

March 23, 1995.

**506**

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, and John Pressley Todd, Asst. Atty. Gen., Phoenix, for State.

Mark A. Bregman, Scottsdale, and Sandra B. Freedman, Tucson, for Ernest Valencia Gonzales.

## OPINION

MARTONE, Justice.

Ernest Gonzales was found guilty of felony murder, aggravated assault, theft, armed robbery, and two counts of burglary. He was sentenced to death on the murder conviction and to prison terms on the noncapital convictions. Appeal to this court is automatic. See Rules 26.15 and 31.2(b), Ariz. R.Crim.P; A.R.S. § 13–4031. We affirm.

### BACKGROUND

Shortly before 7:00 p.m. on February 20, 1990, Roger Daughtry returned home from work and noticed that his porch light was on. He went inside and saw that someone had disassembled his stereo and moved his speakers. Suddenly, a man appeared from behind the speakers, looked at Daughtry, and ran out of the house. Daughtry later identified that man as Ernest Gonzales.

Minutes later, Jeri Sheer, Daughtry's neighbor, took out her trash with her dog, which ran toward a man holding what looked like a tire iron. Sheer looked at the man, grabbed her dog, and went back into her house. When she looked out the window, she noticed the man heading west, the direction of Darrel and Deborah Wagner's townhouse. Sheer later identified the man as Gonzales.

About 7:10 p.m., Darrel Wagner, his wife Deborah, and Deborah's seven-year-old son arrived home from dinner. As they walked into the small courtyard of their townhouse, they noticed that their front door was ajar. Darrel went to investigate while Deborah and her son waited at the gate. As Darrel pushed open the front door, both he and Deborah saw Gonzales standing on the stairway holding their VCR under his arm. Deborah immediately told her son to run to the neighbor's house and call 911. When she turned back toward her home, she saw Gonzales shove her husband out the front door. Darrel lost his balance and fell backward. Gonzales began to stab him repeatedly (seven times in all).

Deborah pleaded with Gonzales to leave. When he did not, Deborah jumped on Gonzales's back and wrapped her arms around him to keep him from stabbing Darrel. Gonzales then swung at Deborah and stabbed her twice. He also apparently wounded himself as he was flailing at Deborah. When Deborah fell off his back, Gonzales left with her purse. A few minutes later, Darrel helped his wife up and both went inside to call 911. Darrel collapsed on the floor during the call and died later that night. Deborah spent five days in intensive care.

Gonzales went from the Wagner residence to his girlfriend's house. She helped clean his wound. Her daughters, Catherine and Martha Trinidad, were there and testified at trial about comments Gonzales made the night of the murder, his clothing, and the "bag" he had with him containing a woman's driver's license and pictures of a boy with red hair—the color of Deborah's son's hair.

Gonzales was tried on a six-count indictment: felony murder of Darrel Wagner, first-degree burglary, aggravated assault of Deborah Wagner, armed robbery of Deborah

Wagner, theft, and burglary of Roger Daughtry's residence. The first trial ended in a hung jury. Gonzales claims that this was because of Deborah's less-than-positive in-court identification. The second jury found Gonzales guilty on all six counts. At that trial, Deborah identified Gonzales without hesitation. At sentencing, the trial court found two aggravating factors, no mitigating factors, and sentenced Gonzales to death on the murder charge and various prison terms for the other crimes.

## ISSUES

We address the following issues raised in Gonzales's brief:

### A. *Trial Issues*

1. Was Martha Trinidad an "unavailable" witness?

2. Did the trial court abuse its discretion by admitting Daughtry's, Sheer's, and Deborah Wagner's in-court identifications?

3. Did the trial court deny Gonzales the right to counsel by denying his request for advisory counsel?

4. Did the trial court abuse its discretion by admitting blood and weatherstripping evidence?

5. Did the trial court deny Gonzales due process by denying his request for appointed serology, fingerprinting, and identification experts?

6. Did Judge Coulter abuse his discretion by denying Gonzales's motion for disqualification of Judge Howe?

7. Did Deborah Wagner's presence during jury selection deny Gonzales a fair trial?

8. Did the trial court err in ruling that statements Gonzales made while being treated in the hospital would be admissible to impeach?

### B. *Sentencing Issues*

1. Was the murder committed for pecuniary gain? A.R.S. § 13–703(F)(5).

2. Did Gonzales knowingly create a grave risk of death to another person in addition to

the victim of the offense? A.R.S. § 13–703(F)(3).

3. Does the fact that Gonzales was convicted for felony murder rather than premeditated murder constitute a mitigating circumstance?

4. Does Gonzales's character evidence amount to a mitigating circumstance?

5. Did the trial court improperly receive victim impact evidence during the sentencing phase?

### C. *Other Issues*

Gonzales also raises the following issues, all of which are meritless and do not warrant separate discussion:

1. Gonzales does not have a right to a jury trial at the sentencing phase. See *Walton v. Arizona*, 497 U.S. 639, 647, 110 S.Ct. 3047, 3054, 111 L.Ed.2d 511 (1990).

2. Death by lethal gas does not constitute cruel and unusual punishment. See *State v. Greenway*, 170 Ariz. 155, 160, 823 P.2d 22, 27 (1991). Moreover, one can now choose lethal injection.

3. Arizona's statutory scheme for imposing the death penalty is not unconstitutional. *Id.*

4. Gonzales's argument that certain counts should have been remanded to the grand jury for a redetermination of probable cause is not subject to review following a finding of guilt beyond a reasonable doubt. *E.g., State v. Charo*, 156 Ariz. 561, 566, 754 P.2d 288, 293 (1988).

### D. *Issues Waived*

Gonzales also raises several claims of error on appeal that are waived because he failed to timely object. After reviewing the record, we do not find that any of the following alleged errors rise to the level of fundamental error:

1. Gonzales argues that the trial court erred by denying his motion to dismiss based on the state's failure to exercise peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). But Gonzales did not object to the state's nonuse of peremptory challenges until

several days after the court impaneled the jury and excused the venire. Thus, he did not timely object and has waived this issue on appeal. *State v. Cruz (II)*, 175 Ariz. 395, 398, 857 P.2d 1249, 1252 (1993) ("*Batson* challenges must be made before the end of the jury selection process or they will not be considered on appeal.").

2. Gonzales argues that the trial court erred by denying his motion to sever Counts I–V (those involving the Wagners) from Count VI (the Daughtry burglary). Gonzales moved to sever before the start of the first trial, but waived this issue by failing to renew his motion during the second trial or at the close of the evidence. Rule 13.4(c), Ariz. R.Crim.P.; *e.g., State v. Haas,* 138 Ariz. 413, 425, 675 P.2d 673, 685 (1983).

3. Gonzales argues that the trial court improperly ruled that his prior convictions would be admissible against him if he testified. But Gonzales did not testify and therefore waived his right to attack the trial court's ruling. *See, e.g., State v. White,* 160 Ariz. 24, 30–31, 770 P.2d 328, 334–35 (1989).

4. Gonzales claims for the first time on appeal that he was denied due process and a fair trial because the trial court did not define "reasonable doubt" in the jury instructions. This is not error, let alone fundamental error. *State v. Bracy,* 145 Ariz. 520, 535, 703 P.2d 464, 479 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986).

5. Gonzales argues that he was prejudiced when two witnesses, Roger Daughtry and Deborah Wagner, violated what he claims was a "sequestration order" by speaking to each other before they testified. He argues that the conversation bolstered Deborah's confidence in her identification. But Gonzales was notified well in advance of the second trial and this conversation that Deborah would identify Gonzales without hesitation. Gonzales made no objection at trial. The court did not commit fundamental error by failing to declare a mistrial *sua sponte.*

6. Gonzales argues that he was denied his right to counsel when the court discussed a juror note with the jury outside the presence of counsel. It appears from the record that the judge simply inquired about the source of the note and did not discuss its contents. Thereafter, he discussed the note with the lawyers, and all agreed that the judge should simply admonish the jury not to form any opinions until all the evidence was in and instruct them on the proper procedure for juror notes. Gonzales made no objection at trial. There was no error, let alone fundamental error.

7. Gonzales argues that the court committed fundamental error by admitting a tire iron and bloody towel that he claims were seized in violation of the Fourth Amendment. But it is clear that Martha Trinidad voluntarily gave the police the evidence on her own initiative. No search took place. There was no error.

## *ANALYSIS*

### A. TRIAL ISSUES

1. *Witness Unavailability*

 Martha Trinidad, the daughter of Gonzales's girlfriend, testified at the first trial. Before the second trial, the prosecution personally served both Martha and her mother on Martha's behalf. However, Martha ran away from home, and neither the state nor her family could find her. The police questioned Martha's mother about her whereabouts, but her mother could only tell them where she usually "hung out." The police looked for her but could not find her. Because of her unavailability, the court admitted her former testimony at the second trial. Gonzales argues that he was denied the right to cross-examine and confront a witness.

Gonzales first argues that the state failed to make a good-faith effort to secure Martha Trinidad's presence at trial, and thus Martha was not "unavailable" under Rule 804(a)(5), Ariz.R.Evid. Gonzales claims that the state knew that Martha had a history of running away and should have tried to hold her in some manner. He argues that, at the very least, the state should have done more than simply drive by places where Martha "hung out."

Most "good-faith efforts" challenges involve unserved witnesses who cannot be lo-

cated. But here, Martha and her mother were personally served. While nothing in Rule 804 suggests that service of a subpoena is a *per se* showing of good-faith efforts, we have said that "the true issue is whether the state made a good-faith effort to *locate* the witness so that he or she could be put under subpoena." *State v. Edwards*, 136 Ariz. 177, 182, 665 P.2d 59, 64 (1983) (citing *State v. Pereda*, 111 Ariz. 344, 345, 529 P.2d 695, 696 (1974) ("If a witness cannot be served by subpoena, it then becomes a matter within the sound discretion of the trial court to determine whether a sufficient effort has been made to place the witness under subpoena.")). Service of process and the efforts made to locate Martha upon learning that she was missing satisfy the unavailability requirement of the rule.

■ Gonzales also argues that even if Martha was "unavailable," her testimony was nevertheless unreliable because the jury was denied the opportunity to observe her demeanor and tone. But that would be true of all non-videotaped former testimony. That argument has long been rejected, and we need not revisit it here. *See, e.g., Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). Moreover, the reliability of Martha's testimony is established without further inquiry because former testimony is a "firmly rooted" hearsay exception. *See White v. Illinois*, 502 U.S. 346, 355, 112 S.Ct. 736, 743 n. 8, 116 L.Ed.2d 848 (1992).

### 2. *Admissibility of In–Court Identifications*

Gonzales argues that the photographic line-up shown to Jeri Sheer and Roger Daughtry was impermissibly suggestive and that, under the totality of the circumstances, their testimony should have been excluded as unreliable. See *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Gonzales moved to suppress the in-court identifications before trial. The court conducted a *Dessureault* hearing, *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), and held that there was no evidence of suggestion or police miscon-

duct. Thus, the court admitted both the out-of-court and in-court identifications. We agree that both were admissible.

■ To establish a due process violation, Gonzales must first establish that the circumstances surrounding the pretrial identification "were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), and that the "state bore sufficient responsibility for the suggestive pretrial identification." *See State v. Williams*, 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987). Gonzales argues that the line-up was suggestive because (1) the background in his photo was lighter than the others, (2) he had a "hostile glare" that gave him a more "criminal look," (3) only three of the men in the line-up had "bushy" mustaches while the others had only thin mustaches, and (4) both Sheer and Daughtry knew that a suspect had been arrested before they viewed the photos.

■ After reviewing the photographic line-up shown to Sheer and Daughtry, we conclude that the trial court did not err in holding that it was not impermissibly suggestive. While upon close examination, the lighting or flash may be brighter in Gonzales's picture, the difference is almost imperceptible. All the persons shown stood against a solid white background. The facial expression Gonzales chose while being photographed was not a function of police conduct. Nor will different facial expressions or hair thickness render a line-up impermissibly suggestive. There is no requirement that the accused be surrounded by nearly identical persons. *State v. Mead*, 120 Ariz. 108, 111–12, 584 P.2d 572, 575–76 (1978) (defendant only person in line-up without facial hair); *see also State v. Alvarez*, 145 Ariz. 370, 372–73, 701 P.2d 1178, 1180–81 (1985) (line-up not impermissibly suggestive where only the defendant had facial moles like those described by the victim and where defendant was only one of two Hispanics shown). Finally, it is clear that the witnesses knew that a suspect had been arrested through sources independent of the police. The trial court correctly ruled that there was no police misconduct

that created an unduly suggestive pretrial identification procedure.

 Gonzales also argues that because he sat next to defense counsel during the first trial in which Deborah Wagner testified, she took part in an impermissibly suggestive identification procedure, making it necessary for the court to determine the reliability of her in-court identification at the second trial. By failing to object before trial, however, Gonzales has waived his objection. Moreover, merely sitting at the defense table during trial where the defendant is neither shackled nor dressed in prison garb is not unduly suggestive, and thus no hearing was necessary. *State v. Meeker*, 143 Ariz. 256, 265, 693 P.2d 911, 920 (1984).

### 3. *Right to Counsel*

Some time after the second trial, the court granted Gonzales's request to again proceed *pro per*,[1] but on its own initiative appointed him advisory counsel. On the day scheduled to hear Gonzales's motion for new trial, the judge granted advisory counsel's motion to withdraw without objection from Gonzales. When the judge sought argument on the motion, Gonzales asked the court to appoint new advisory counsel and to grant a continuance. The court denied the request.[2] After several days of argument, the court denied the motion for new trial. Gonzales argues that he was denied his right to counsel because he did not knowingly and intelligently waive the right, and, even if he did, he withdrew that waiver and was thereafter denied appointed counsel at the start of the hearing on his motion.

 Gonzales argues that he did not knowingly and intelligently waive his right to counsel in the first place because the trial court downplayed the magnitude of a possible death sentence by stating that Arizona had not carried out a death sentence since the early 1960s. This argument is without merit. The record is clear that the judge made the appropriate inquiries and admonitions and properly found Gonzales's waiver to be knowing and intelligent.

 Even if his waiver of counsel were knowing and intelligent, Gonzales claims that he withdrew his waiver. He relies primarily on Rule 6.1(e), Ariz.R.Crim.P., which states that a defendant may withdraw his waiver of the right to counsel at any time. But Gonzales asked for advisory counsel, which is discretionary under Rule 6.1(c), Ariz.R.Crim.P.[3] He did not ask to have counsel appointed. He thus did not withdraw his waiver of counsel. The court did not abuse its discretion by failing to continue the hearing and by refusing to appoint new advisory counsel. The right to represent oneself is a constitutional right. *Faretta v. California*, 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). A court may not interfere with that choice without an unequivocal revocation of the defendant's waiver of counsel. *State v. Rickman*, 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986). "Once a defendant has waived his right to counsel, that waiver continues until he 'clearly' indicates a change of mind." *Id.* After reviewing the record, we find that Gonzales never withdrew his waiver of counsel.

### 4. *Blood and Weatherstripping Evidence*

The police went back to the Wagner townhouse one week after the murder to gather additional physical evidence. They collected additional blood samples. They also removed weatherstripping to see whether a lug wrench had been used to pry open the door.

Although Gonzales did not object to the testimony about this evidence at trial, he did object to the admission of the physical evidence itself, arguing that it had been taken from the scene too long after the crime. The court overruled the objection and admitted

---

1. Gonzales had previously been granted a request to proceed *pro per*, but later changed his mind and was again appointed counsel.

2. Although the court refused to delay the hearing on the motion for new trial, it did appoint advisory counsel at the conclusion of the hearing to assist Gonzales at the sentencing phase. The court later granted Gonzales's request that advisory counsel become counsel of record for the aggravation/mitigation hearing.

3. The record clearly indicates that Gonzales was seeking *advisory* counsel only. (R.T. of Dec. 9, 1991, at 17–22; R.T. of Dec. 17, 1991, at 2, 4).

the evidence. Gonzales now argues that the court should have excluded this evidence under Rule 403, Ariz.R.Evid., and because the state failed to establish a chain of custody. We reject both of these arguments.

Gonzales's argument that the blood drops and weatherstripping should have been excluded under Rule 403 is without merit. He has pointed to nothing that would suggest that this evidence was unfairly prejudicial. Moreover, Gonzales failed to object to the evidence on Rule 403 grounds at trial and has thus waived his objection. *See State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987).

Gonzales also argues that because the evidence was not gathered from the unsecured crime scene until seven days after the crime, the state could not show a chain of custody. Gonzales's argument that evidence may have been contaminated goes to the weight of the evidence, not its admissibility. *State v. Blazak*, 114 Ariz. 199, 203, 560 P.2d 54, 58 (1977), *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). The contamination argument was fully explored on cross-examination and argued to the jury. The court did not abuse its discretion in admitting the physical evidence.

### 5. *Appointment of Experts*

Relying on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (a state must provide an indigent defendant a psychiatrist where the defendant's sanity is a significant factor at trial), Gonzales argues that he was denied due process when the trial court refused to appoint him serology, fingerprinting, and identification experts for the second trial. The state argues that *Ake* applies only to cases in which sanity is at issue and that this case is governed by A.R.S. § 13–4013(B), which entitles indigent defendants in capital cases to experts that "are reasonably necessary" to adequately present a defense. Both *Ake* and the statute, however, require the same threshold showing of "reasonable necessity." *State v. Williams*, 166 Ariz. 132, 139, 800 P.2d 1240, 1247 (1987).

Gonzales failed to make the necessary threshold showing. He did not explain how a fingerprint expert would be helpful, let alone necessary, to his defense. The state did not offer fingerprint evidence against him. Gonzales made only general references to the credibility of Deborah's identification testimony to support his request for a serologist and an identification expert. *See State v. Apelt (Rudi)*, 176 Ariz. 369, 375, 861 P.2d 654, 660 (1993) (defendant failed to describe the evidence he believed was available), *cert. denied*, — U.S. ——, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994); *State v. Greenawalt*, 128 Ariz. 150, 156, 624 P.2d 828, 834 (defendant must show what was to be investigated and why it was believed to be material), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).[4] Appointment of experts is within the sound discretion of the trial court. *State v. Amaya–Ruiz*, 166 Ariz. 152, 182, 800 P.2d 1260, 1290 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). Absent substantial prejudice, we will not disturb the trial court's refusal to appoint experts. *Id.* We find that Gonzales failed to make the necessary threshold showing, and thus the trial court did not abuse its discretion.

### 6. *Impartiality of Trial Judge*

Before the second trial, Gonzales moved to disqualify Judge Howe, arguing that he was biased and prejudiced. Gonzales had the burden of proving bias by a preponderance of the evidence. Rule 10.1(c), Ariz. R.Crim.P. Judge Coulter heard Gonzales's motion and denied it. We review that ruling on an abuse of discretion standard. *State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984).

Gonzales points to several exchanges that he claims demonstrate the judge's animosity toward him, and argues that he was denied a fair trial and sentencing. But Gonzales was a difficult litigant, and while the judge understandably became impatient with him, particularly while he was acting *pro per*,

---

4. Moreover, it does not appear that the identification expert testimony would have been admissible under *State v. Chapple*, 135 Ariz. 281, 293, 660 P.2d 1208, 1220 (1983) (expert testimony on eyewitness identification properly excluded in "great majority" of cases).

none of the exchanges would support Gonzales's claim of bias. Nor did any of the exchanges take place in front of the jury. Other than pointing to the motions the judge denied and the sentence he imposed, Gonzales has not shown how he was prejudiced. *See Liteky v. United States*, —— U.S. ——, ——, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women … sometimes display.") We find that Judge Coulter properly denied Gonzales's motion for disqualification of Judge Howe.

### 7. *Victim's Presence in the Courtroom*

■ Gonzales argues that Deborah's presence in the courtroom during jury selection and her possible presence during trial after she testified prejudiced him and denied him the right to a fair trial. This argument is without merit. Deborah had a constitutional right to attend all criminal proceedings that Gonzales had the right to attend. Ariz. Const. art. 2, § 2.1(A)(3); Rule 9.3(a), Ariz. R.Crim.P. Deborah, on her own initiative, attended jury selection. She sat in the back row of the courtroom, and neither the court nor counsel knew she was there until several days later. Nor is there any evidence that prospective jurors noticed Deborah or knew who she was during jury selection. Gonzales has not shown that Deborah's presence during jury selection was prejudicial. There is no evidence that Deborah intended to or did remain in the courtroom after she testified, and therefore we consider the matter no further. *State v. Ethington*, 121 Ariz. 572, 574, 592 P.2d 768, 770 (1979).

### 8. *Use of Gonzales's Statements for Impeachment*

■ While Gonzales was being treated in the hospital for an injury he received during his arrest, he was interrogated by police in violation of his *Miranda* rights. The court excluded his statements in the state's case-in-chief, but ruled them admissible to impeach under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Gonzales argues that the statements should have been excluded for all purposes because his medical condition at the time rendered all of his statements involuntary. *See Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) ("*[A]ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law."). Gonzales argues that he could not take the stand in his own defense.

■ In *State v. Conner*, 163 Ariz. 97, 103, 786 P.2d 948, 954 (1990), we held that by choosing not to testify, a defendant waives his right to challenge the court's pretrial ruling that statements made in violation of *Miranda* would be admissible to impeach. The same policy considerations that led to the result in *Conner* are present here. The admission of involuntary statements is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). Without the defendant's testimony, however, we are unable to determine whether error is prejudicial. The state may choose not to use a statement. Requiring the defendant to testify ensures that the reviewing court is presented with an actual, rather than hypothetical, injury. *Conner*, 163 Ariz. at 103, 786 P.2d at 954. It also "prevents defendant from 'cynically manufacturing a basis for a possible appeal by falsely alleging that the threat of impeachment alone deterred him from testifying.'" *Id.* (citation omitted). Whether the impeaching statement was obtained in violation of *Miranda* or was involuntary, prejudice is hypothetical when the defendant does not testify. We hold that by choosing not to testify, Gonzales waived his right to claim that the trial court erroneously ruled involuntary statements admissible to impeach.

■ Even ·if not waived, we agree with the trial court's voluntariness finding. Our inquiry is whether the confession was the product of "a rational intellect and a free will." *Mincey*, 437 U.S. at 398, 98 S.Ct. at 2416. Gonzales was in the hospital having his wound cleaned. He was not strapped down, sedated, or incoherent. In fact, he stated that the pain from his wound "kept his head clear." (R.T. of Jan. 16, 1991, at 78).

Gonzales understood and responded to the questions and even asked questions about statements he believed his girlfriend had made. Gonzales's will was not overborne. This case is not like *Mincey* where the defendant was in intensive care, confined to bed, in extreme pain, heavily sedated, confused, incoherent, and eventually unconscious. Gonzales's statements were not coerced. The trial court did not err in ruling them admissible to impeach.

## B. SENTENCING ISSUES

### 1. *Propriety of the Death Sentence*

███ The state must prove beyond a reasonable doubt the existence of aggravating circumstances contained in A.R.S. § 13–703(F). *State v. Kiles,* 175 Ariz. 358, 369, 857 P.2d 1212, 1223 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). The defendant must prove the existence of statutory or nonstatutory mitigating circumstances by a preponderance of the evidence. *Id.* at 373, 857 P.2d at 1227. The court must impose a death sentence if it finds at least one aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency. A.R.S. § 13–703(E). In all death penalty cases we independently review the record and facts establishing aggravating and mitigating circumstances to determine whether the former outweigh the latter. *State v. Wood,* 180 Ariz. 53, 68, 881 P.2d 1158, 1173 (1994). We must ensure that the Arizona capital sentencing scheme "genuinely narrow[s] the class of persons eligible for the death penalty." *Arave v. Creech,* —— U.S. ——, ——, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993).

### a. *Aggravation*

Following an aggravation/mitigation hearing, the court returned a special verdict pursuant to A.R.S. § 13–703(D). It found two aggravating circumstances: (1) that in the commission of the offense Gonzales knowingly created a grave risk of death to another person in addition to the victim of the offense, and (2) that Gonzales committed murder in expectation of pecuniary gain. See A.R.S. §§ 13–703(F)(3) and (F)(5). Finding no mitigation sufficiently substantial to call

for leniency, the court sentenced Gonzales to death. Gonzales challenges each of the statutory aggravators.

#### i. *Pecuniary Gain*

██ Gonzales argues that the evidence does not support a finding that he committed the murder in expectation of pecuniary gain. He claims that the robbery ended when he was confronted by Darrel Wagner and that the subsequent murder was "unexpected and accidental." *See State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) ("Factors to be considered in making this [pecuniary gain] determination are whether the murder was part of a larger scheme or was instead unexpected or accidental."). We do not agree.

To prove the A.R.S. § 13–703(F)(5) aggravating factor, the state must show that a motivation for the murder was the expectation of pecuniary gain. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). We have held that when the defendant kills to facilitate his escape and to permit him to take and keep stolen items, he furthers his pecuniary gain motive. *Id.* The Wagners interrupted Gonzales during the burglary of their home. Gonzales was there to steal from them. "[H]e expected pecuniary gain and this expectation tainted all of his other conduct." *Id.* (interrupted burglary); *see, e.g., State v. Runningeagle,* 176 Ariz. 59, 65, 859 P.2d 169, 175 (interrupted burglary), *cert. denied,* —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993).

The trial court found beyond a reasonable doubt that Gonzales intended to kill Darrel. His murder was not "accidental." This is plainly evident from the number of stab wounds. Gonzales's primary motivation was to steal the Wagner's property. Darrel's murder was directly connected to that goal. *See Correll,* 148 Ariz. at 479, 715 P.2d at 732. We agree with the trial court that the murder of Darrel Wagner was committed for pecuniary gain.

#### ii. *Grave Risk of Death*

██ The trial court also found that Gonzales knowingly created a grave risk of death

to another person (Deborah Wagner) in addition to the victim of the offense. See A.R.S. § 13–703(F)(3). The court determined that Deborah was "within the zone of danger during the time [Gonzales] was stabbing Darrel Wagner, and quite aside from that time in which [Gonzales] was deliberately and independently stabbing Deborah Wagner." Special Verdict at 1. We agree with the trial court that Gonzales knowingly placed Deborah in grave risk of death even before turning his weapon on her.

"Our inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injuries." *Wood,* 180 Ariz. at 69, 881 P.2d at 1174. Deborah was confined in a small (10′ × 10′) courtyard with Gonzales as he repeatedly stabbed her husband. See *State v. McMurtrey,* 151 Ariz. 105, 108, 726 P.2d 202, 205 (1986) (presence of others in immediate area supports grave risk circumstance), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987); *State v. Nash,* 143 Ariz. 392, 405, 694 P.2d 222, 235 (1985) (close proximity to murder victim supports grave risk circumstance). Moreover, Deborah was not just a bystander. She attempted to rescue her husband by jumping on Gonzales's back as he was stabbing Darrel. Whether she could have instead retreated is irrelevant. One who murders knowing others are present can expect that someone may attempt to interfere, particularly when that person is the victim's spouse.[5] Gonzales's actions created a "zone of danger" for Deborah in which there was a realistic possibility that she may have suffered fatal injuries. Indeed, she almost died. This grave risk occurred, as the statute requires, during the commission of the offense against Darrel.

We reject Gonzales's argument that § 13–703(F)(3) does not apply because Deborah was an "intended victim" of the offense. For Deborah to have been an intended victim, as contemplated by our cases, Gonzales must

have acted with the intent to kill her. *See, e.g., Fierro,* 166 Ariz. at 550, 804 P.2d at 83 ("Fierro's acquittal on the charge of attempted murder establishes that Manross was not an intended victim of the shooting"). Moreover, the intent to kill must have been formed *before* Deborah was placed in grave risk of death. Gonzales argues that Deborah became an intended victim the moment she jumped on his back. But Deborah was placed in grave risk *before* she jumped on his back. Thus, even if Gonzales stabbed Deborah with the intent to kill her, the "intended victim" argument fails because that intent was not formed before Deborah was placed in grave risk. Additionally, there was no evidence that Gonzales intended to kill Deborah, and the state did not charge him with her attempted murder.[6] Gonzales's only intended murder victim was Darrel. When Deborah jumped on Gonzales's back, his intent was to get her off. He did this by using his body and his weapon, seriously injuring her in the process. Once he threw her off his back, he fled the scene. Gonzales's reliance on the "intended victim" cases is thus misplaced. We find that § 13–703(F)(3) is satisfied.

### b. *Mitigation*

 In capital sentencing proceedings, the trial court must consider the mitigating factors in A.R.S. § 13–703(G) as well as any aspect of the defendant's background or the offense relevant to determining whether the death penalty is appropriate. *State v. Bible,* 175 Ariz. 549, 605, 858 P.2d 1152, 1208 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). After considering all of the evidence, the trial court found no mitigating circumstances. Gonzales argues that the judge should have found that his felony murder conviction and his good character constituted mitigating circumstances and that mitigation outweighed aggravation, thus making the death penalty inappropriate.

---

5. Gonzales argues that there is no evidence to support the finding that he knew Deborah was present at the murder scene and thus could not "knowingly" have created a grave risk of death to her. The evidence, however, shows otherwise.

6. Gonzales admits that "there is no evidence in the record to indicate that he intended to harm [Deborah] ... even when [she] jumped on his back." (Reply Brief at 4).

*i. Felony Murder Theory as Mitigation*

■ Gonzales argues that the fact that he was convicted of felony murder, rather than premeditated murder, constitutes a mitigating circumstance and mandates a finding that mitigation outweighs aggravation. In *State v. Zaragoza*, 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983), we held that a felony murder conviction is not relevant to a determination of mitigation "in a case where the defendant intended to kill the victim or where the defendant knew with substantial certainty that his conduct would cause death." Here, the trial court made a specific finding beyond a reasonable doubt that Gonzales did the killing and intended to kill Darrel Wagner. *See State v. Herrera (Mickel)*, 174 Ariz. 387, 397, 850 P.2d 100, 110 (1993) (a trial court may make an *Enmund* finding in a felony murder case). Gonzales stabbed Darrel seven times. The evidence does not support Gonzales's argument that the death was "accidental." Gonzales's conviction based on felony murder is not a mitigating circumstance.

*ii. Character Evidence*

■ The trial court found that "the evidence of Defendant's good character when he is not committing crimes is not a mitigating factor." Special Verdict at 4. Gonzales argues that this means that the trial court admitted that good character had been proved, but refused to assign any mitigating weight to it. Relying on *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), he argues that the trial court must give some mitigating weight to aspects of the defendant's character and that it was improper to find that it was not a mitigating factor.

■ From the detailed special verdict, it is clear that the trial court considered all evidence offered in mitigation. He was required to do no more. *See Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982) (applying the rule of *Lockett v. Ohio* that the "sentencer in capital punishment cases must be permitted to consider any relevant mitigating factor"); *State v. McDaniel*, 136 Ariz. 188, 665 P.2d 70 (1983) (trial court must consider any relevant aspect of a defendant's character), *cert. denied*, 499 U.S. 952, 111 S.Ct. 1426, 113 L.Ed.2d 478 (1991). Although the court must consider relevant evidence offered in mitigation, it is not required to find that evidence to be mitigating. If it does find that the evidence is mitigating, the weight to be given that evidence is within its discretion. *State v. Atwood*, 171 Ariz. 576, 648, 832 P.2d 593, 665 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); *State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983).

Here, the trial court considered the character evidence Gonzales offered and found that it did not constitute a mitigating factor. Gonzales was on parole at the time he committed this murder. He had four prior felony convictions and a long criminal record starting as a juvenile. The trial court did not believe that Gonzales had a "good character," and neither do we.

■ We have examined the record and do not find evidence of good character that would constitute a mitigating circumstance sufficiently substantial to call for leniency. Gonzales offered as mitigating evidence brief testimony from various family members that they got along with him, trusted him, did not consider him violent, and would continue a relationship with him if he were sentenced to prison instead of death. This evidence is better characterized as familial support than good character. In any event, even if this evidence had some mitigating weight, which it does not, it would be *de minimis*, making remand unnecessary. *See Bible*, 175 Ariz. at 609, 858 P.2d at 1212.

*c. Imposition of the Death Penalty*

The state proved the existence of the A.R.S. § 13–703(F)(3) and (F)(5) factors beyond a reasonable doubt. The trial court found no statutory or nonstatutory mitigating circumstances. We have also reviewed the record for evidence of mitigation and have found none sufficiently substantial to call for leniency. The trial court correctly concluded that the aggravating factors outweighed the mitigating factors. A.R.S. § 13–

**516**

703(E) thus requires imposition of the death penalty.

2. *Victim Impact Statements*

 Finally, Gonzales argues that the trial court erroneously received and considered Deborah's recommendation that he receive the death penalty, and the investigating detectives' recommendation that he receive the "maximum penalty." Gonzales relies on *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). *Booth,* however, was overruled by *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that the Eighth Amendment does not bar victim impact information in capital sentencing. In Arizona, victims have a state constitutional right to be heard at sentencing. Ariz. Const. art. 2, § 2.1(A)(4). *See also* A.R.S. § 13–4410(C), –4424, –4426 (victim may submit oral or written impact statement at sentencing for trial court's consideration); *Atwood,* 171 Ariz. at 656–57, 832 P.2d at 673–74 (trial court may rebut evidence offered in mitigation with relevant victim impact evidence). Moreover, trial courts are presumed to be able to focus on relevant sentencing factors and set aside the "irrelevant, the inflammatory, and the emotional factors." *Atwood,* 171 Ariz. at 657, 832 P.2d at 674. Gonzales has not shown any evidence to suggest that these "recommendations" improperly affected the sentencing decision.

### DISPOSITION

We have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We have found none. For the above reasons, we affirm Gonzales's convictions and sentences.

FELDMAN, C.J., MOELLER, V.C.J. and CORCORAN and ZLAKET, JJ., concur.