SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-05-0508-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2001-015915 |
| FRANK DALE MCCRAY, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Douglas L. Rayes, Judge

**AFFIRMED AS MODIFIED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
      By    Kent E. Cattani, Chief Counsel
            Capital Litigation Section
            Jon G. Anderson, Assistant Attorney General
Attorneys for the State of Arizona

BRUCE PETERSON, OFFICE OF THE LEGAL ADVOCATE              Phoenix
      By    Kerri L. Chamberlin, Deputy Legal Advocate
Attorneys for Frank Dale McCray
_____

**B A L E S**, Justice

¶1     This mandatory appeal concerns Frank Dale McCray's conviction and death sentence for the murder of Chestene Cummins. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2        On May 21, 1987, Chestene Cummins was strangled to death in her Phoenix apartment. Her boyfriend found her body on the floor with her mouth gagged, her body heavily bruised, her pants removed, and her shirt sliced open. She had been strangled with a sweatpants drawstring that was wrapped three times around her neck. The apartment was in disarray and there were signs of a struggle. Cummins's wallet and rings were missing. The only fingerprints indentified at the scene belonged to Cummins, her boyfriend, and her sister.

¶3        During an autopsy the next day, Cummins's vagina, rectum, and mouth were swabbed for fluid. The medical examiner's office tested fluid from each swab for acid phosphatase, an enzyme found in semen, and all the tests were negative. Fluid from each swab was also placed on separate filter papers that were sent to the Department of Public Safety crime lab. Unlike the medical examiner, a DPS analyst found acid phosphatase in the fluid from the vaginal and oral swabs. DPS froze and retained portions of the samples. DPS also identified acid phosphatase on other objects from the apartment. In 1987, DNA technology could not identify a perpetrator from the evidence, and the crime remained unsolved for more than a decade.

¶4        In 1997, the blood of Frank McCray, who had been imprisoned for a 1992 sexual assault, was drawn and stored pursuant to A.R.S. § 13-4438 (Supp. 1997) (since renumbered as A.R.S. § 13-610 (Supp. 2007)), which required DNA samples to be collected and retained for sex offenders.  In 2000, DPS entered a DNA profile of McCray's blood into its database.

¶5        A few months later, a Phoenix detective asked DPS to run a DNA test on the samples taken in 1987 from Cummins's body. A DPS criminalist identified DNA from semen in both the vaginal and oral samples and entered the DNA profile into the DPS database.  The DNA matched that of McCray.  To verify the match, the criminalist prepared a new profile from McCray's blood.  She found that it also matched the profile from the DNA in the semen on the samples taken from Cummins's body.

¶6        McCray was indicted in 2001 for murder, sexual assault, and burglary.  The sexual assault and burglary charges were dismissed because the statutes of limitations had run.  In 2005, a jury convicted McCray of first-degree felony murder.  In the penalty phase of the trial, the jury found two aggravating factors: McCray had been previously convicted of a felony involving violence, *see* A.R.S. § 13-703(F)(2) (1978 & Supp. 1987), and the murder was especially cruel, *id.* § 13-703(F)(6). After the jury determined McCray should receive a death

3

sentence, the trial court entered a sentence of death by lethal injection.  This appeal followed.

**DISCUSSION**

**¶7**     McCray raises four issues on appeal.  For the reasons explained below, we affirm his conviction and, as modified, his death sentence.

### A. Chain of custody

**¶8**     McCray argues that the trial court erred in admitting the DNA evidence because the State did not establish a sufficient chain of custody to authenticate the evidence.  A trial court's conclusion that evidence has an adequate foundation is reviewed for an abuse of discretion.  *State v. Romanosky*, 162 Ariz. 217, 224, 782 P.2d 693, 700 (1989).

**¶9**     An item is authenticated when there is "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Ariz. R. Evid. 901(a).  A party seeking to authenticate evidence based on a chain of custody "must show continuity of possession, but it need not disprove every remote possibility of tampering."  *State v. Spears*, 184 Ariz. 277, 287, 908 P.2d 1062, 1072 (1996).  Furthermore, "[a party] need not call every person who had an opportunity to come in contact with the evidence sought to be admitted."  *State v. Hurles*, 185 Ariz. 199, 206, 914 P.2d 1291, 1298 (1996).

4

¶10     McCray argues that the State failed to establish a sufficient chain of custody from the time the fluid samples were taken from Cummins's body at the autopsy until they were delivered later that day to DPS.  In particular, McCray argues that the chain of custody was deficient because neither the medical examiner who performed the autopsy nor his assistant testified about taking the samples.  Instead, Detective Mitch Rea, who attended the autopsy, testified that he was present when the swabs were taken, that the swabs were then each wiped on filter papers, that the medical examiner then gave him the filter paper samples in separate envelopes, and that Rea later delivered these samples, along with other evidence, to DPS.

¶11     To support his position, McCray cites this Court's opinion in *State v. Ritchey*, which observed that evidence can be admitted "notwithstanding the inability of the state to show a continuous chain of custody . . . unless a defendant can offer proof of actual change in the evidence, or show that the evidence has, indeed, been tampered with."  107 Ariz. 552, 557, 490 P.2d 558, 563 (1971).  McCray argues that the circumstances here reflect a change in or tampering with the evidence.

¶12     McCray notes that Rea said the medical examiner took the swabs, while other evidence showed that the medical examiner's office usually had an assistant take the swabs.  He also notes that Rea initially testified that the medical

5

examiner had placed each sample in a separate envelope and that Rea had then packaged each one in an additional envelope; however, the DPS criminalist who received them testified that each sample was inside only one envelope. (When recalled, Rea testified that he must not have repackaged the swab samples.) Finally, McCray argues that the evidence was changed because the medical examiner did not identify acid phosphatase on the samples, but DPS later found this enzyme present.

¶13 Even if we accept McCray's interpretation that *Ritchey* requires a "complete" chain of custody when there is proof of tampering or a change in the evidence, the trial court did not abuse its discretion in admitting the DNA evidence here. The inconsistent test results did not prove some actual change in the evidence. Instead, as noted in the trial testimony of both a medical examiner and a DPS analyst, the different results might be explained by technical limitations on the medical examiner's tests, insufficient semen on the swabs after fluid was transferred to the filter papers, or environmental degradation of the swabs.

¶14 Nor has McCray shown any tampering with the evidence. Indeed, it is hard to imagine how his semen could somehow have been improperly placed on the filter papers in 1987. McCray does not challenge the chain of custody after the samples were delivered to DPS, which extracted DNA from semen in these

samples and later matched it with DNA taken in 1997 from McCray's blood, not his semen.

¶15    Detective Rea described from personal knowledge the chain of custody of the fluid samples from their collection at the autopsy to their delivery to DPS. To the extent his recollection of the events was incomplete or conflicted with testimony by other witnesses, these concerns go to the weight rather than the admissibility of the evidence. *See State v. Gonzales*, 181 Ariz. 502, 511, 892 P.2d 838, 847 (1995). The trial judge did not abuse his discretion in admitting the DNA evidence.

### B.    The (F)(2) aggravator

¶16    McCray argues that the trial court erred in holding that his 1993 conviction for a 1992 sexual assault with a dangerousness enhancement qualified him for the (F)(2) prior violent crime aggravator. This Court reviews *de novo* whether a prior crime was violent for the purposes of the (F)(2) aggravator. *State v. Smith*, 215 Ariz. 221, 227 ¶ 14, 159 P.3d 531, 537 (2007), *cert. denied*, 128 S. Ct. 466 (2007).

¶17    Under the applicable statute, a first-degree murder may be aggravated when "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." A.R.S. § 13-703(F)(2). In determining whether a prior felony involved violence or threats,

we must look to the "statutory definition" of the crime, not the particular facts of the case. *State v. Henry*, 176 Ariz. 569, 587, 863 P.2d 861, 879 (1993). In other words, if the offense *could* have been committed without the use or threat of violence, the prior conviction does not qualify as an (F)(2) aggravator.

¶18    McCray's prior conviction was for sexual assault with a dangerousness enhancement in violation of A.R.S. §§ 13-1406(A) (1989) and 13-604(G) (1989). McCray first argues that this offense cannot qualify for the (F)(2) aggravator because in 1992 sexual assault could be committed not only by force or threat of force but also by deceit or a victim's otherwise invalid consent. *See State v. Bible*, 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993). McCray also contends that the dangerousness enhancement under A.R.S. § 13-604(G) should not be considered as part of the statutory definition of his prior crime.[1]

¶19    For purposes of applying the (F)(2) aggravator, courts should consider the fact that a prior conviction included an enhancement for dangerousness. The dangerous nature of the offense must, under A.R.S. § 13-604(K) (renumbered as A.R.S. § 13-604(P) (2001 & Supp. 2007)), be charged and be either admitted by the defendant or found by the trier of fact. The

---

[1]    In 1993, the legislature rewrote the (F)(2) statute to list the crimes that qualify for the aggravator. 1993 Ariz. Sess. Laws 745-48. One of the listed crimes is sexual assault. A.R.S. § 13-703(I)(5) (Supp. 2007).

allegation of dangerousness in effect adds to the underlying offense an element that subjects the defendant to increased penalties.

¶20     To determine if a prior offense involved the threat or use of violence, we consider the specific statutory subsection under which a defendant was convicted, even if violations of other subsections of the same statute may not qualify for the (F)(2) aggravator. *See, e.g., State v. Ramirez,* 178 Ariz. 116, 129-30, 871 P.2d 237, 250-51 (1994). Considering a prior offense as enhanced for dangerousness is analogous to focusing on the particular statutory subsection underlying a prior conviction. *Cf. State v. Correll*, 148 Ariz. 468, 478-79, 715 P.2d 721, 731-32 (1986) (considering a California robbery conviction with firearm enhancement in determining if (F)(2) aggravator applied).

¶21     McCray also contends, however, that sexual assault with a dangerousness enhancement is not a crime that by its statutory definition satisfies the (F)(2) aggravator. When the sexual assault occurred, Arizona's enhancement statute defined a dangerous felony as a "felony *involving* use or exhibition of a deadly weapon or dangerous instrument or . . . the intentional or knowing infliction of serious physical injury upon another." A.R.S. § 13-604(G) (renumbered as A.R.S. § 13-604(I) (2001 & Supp. 2007)) (emphasis added).

9

¶22     Is it possible for sexual assault to be enhanced as dangerous but *not* involve the "use or threat of violence"?  Even without the enhancement, a sexual assault that is accomplished by force or threat of force would involve the use or threat of violence.  Thus, the issue reduces to whether it is possible for a defendant to commit sexual assault through deceit or the victim's otherwise invalid consent (e.g., intoxication or drugs), yet for the offense to be enhanced as one "involving the use or exhibition" of a deadly weapon or dangerous instrument.  In arguing that there can be a dangerous but non-violent sexual assault, McCray offers the following hypothetical: a defendant deceives his victim into engaging in sexual conduct and then fires a non-threatening celebratory shot into the air.

¶23     McCray's argument presumes an unduly broad interpretation of the word "involving" as it is used in the enhancement statute.  For purposes of A.R.S. § 13-604(G), an offense is one "involving" the "use or exhibition" of a deadly weapon or dangerous instrument if the use or exhibition helps accomplish the underlying offense.  Using or exhibiting a weapon or dangerous instrument to accomplish a sexual assault must, as a practical matter, involve at least a threat of violence.  The hypothetical posed by McCray would not be a sexual assault "involving" the use or exhibition of a deadly weapon or dangerous instrument, even though the imaginary gun might be

10

visible or fired in a non-threatening way.[2] *Cf. State v. Greene*, 182 Ariz. 576, 581, 898 P.2d 954, 959 (1995) (holding, for purposes of A.R.S. § 13-604.02(A), that an offense is not one "involving" injury merely because the injury occurs at same time as the crime or increases its likelihood).

¶24     Stated differently, we conclude that a sexual assault that "involv[es] use or exhibition of a deadly weapon or dangerous instrument" within the meaning of A.R.S. § 13-604(G) is necessarily one that "involv[es]" the use or threat of violence.  Accordingly, we hold that the trial court did not err in instructing the jury as to the (F)(2) aggravator.

### C.   The (F)(6) aggravator

¶25     McCray next argues that the trial court violated his right to due process by providing the jury with an unconstitutionally vague instruction on the "especially cruel" aspect of the (F)(6) aggravator.  "We review *de novo* whether jury instructions adequately state the law." *State v. Tucker*, 215 Ariz. 298, 310 ¶ 27, 160 P.3d 177, 189 (2007), *cert. denied*, 128 S. Ct. 296 (2007).

---

[2]     The legislature amended the enhancement statute in 1993 to refer to offenses "involving the use or *threatening* exhibition" of a deadly weapon or dangerous instrument.  1993 Ariz. Sess. Laws 1411 (codified as amended at A.R.S. § 13-604(I) (2001 & Supp. 2007)).    This statutory change does not alter our conclusion, which turns on the meaning of the term "involving" in the context of sexual assault; we need not address the consequences of the 1993 amendment with regard to other crimes.

11

¶26    The trial court instructed the jury on the meaning of both "especially cruel" and "cruelty."[3]  We recently approved a nearly identical (F)(6) instruction.  *Id*. at 310-11, ¶¶ 29-33, 160 P.3d at 189-90.  We hold that the instruction in this case was not unconstitutionally vague.

### D. Means of execution

¶27    McCray argues, and the State concedes, that his sentence improperly specifies that he shall be executed by means of lethal injection.  Because McCray committed the murder before November 23, 1992, he is entitled under A.R.S. § 13-704(B) (2001) to choose between lethal injection and lethal gas.  This Court can correct an illegal sentence, A.R.S. § 13-4037(A)

---

[3]    The instruction read:

Definition of "Especially Cruel"

Concerning this aggravating circumstance, all first degree murders are to some extent cruel.  However, this aggravating circumstance cannot be found to exist unless the murder is especially cruel, that is, where the circumstances of the murder raise it above the norm of other first degree murders.

"Cruelty"

Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death.  A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death.  The victim must be conscious when the pain and/or anguish was inflicted.

(2001), and we modify McCray's sentence to provide that the manner of execution shall be determined as provided in A.R.S. § 13-704(B).

### E. Independent review

¶28 Because Cummins's murder occurred before August 1, 2002, this Court independently reviews the "findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-703.04(A) (Supp. 2007); *see* 2002 Ariz. Sess. Laws 2158.

### 1. Aggravating circumstances

¶29 The jury found two aggravating circumstances: McCray had been "previously convicted of a felony in the United States involving the use or threat of violence on another person," A.R.S. § 13-703(F)(2), and he had committed the murder "in an especially cruel . . . manner," *id.* § 13-703(F)(6).

### a. The (F)(2) aggravator

¶30 The (F)(2) aggravator was proved beyond a reasonable doubt by evidence of McCray's 1993 conviction for sexual assault with the dangerousness enhancement. *See supra*, ¶¶ 16-24.

### b. The (F)(6) aggravator

¶31 A first degree murder is "especially cruel" when the victim suffered physical pain or mental anguish and the defendant knew or should have known that the victim would

13

suffer. *Tucker*, 215 Ariz. at 310-11 ¶ 31, 160 P.3d at 189-90. The victim, however, need not have been conscious for "each and every wound inflicted." *State v. Sansing*, 206 Ariz. 232, 235 ¶ 7, 77 P.3d 30, 33 (2003). The entire murder transaction, not just the final act, may be considered. *State v. Ellison*, 213 Ariz. 116, 142 ¶ 119, 140 P.3d 899, 925 (2006), *cert. denied*, 127 S. Ct. 506 (2006).

¶**32**     The evidence indicates that McCray forced his way into Cummins's apartment, physically assaulted her, raped her, and strangled her with a cord.  At trial, the county's chief medical examiner, Dr. Phillip Keen, testified about the results of the 1987 autopsy, which had been performed by another doctor.  Keen said that Cummins probably died one to five minutes after the strangulation began, and he concluded from both the nature of her injuries and the condition of the apartment that a struggle probably occurred.

¶**33**     In our independent review, we find that Cummins was conscious during a substantial part of the "murder transaction" and that she suffered intense physical pain and mental anguish during that time.  McCray should have known that attacking, raping, and strangling Cummins would cause her severe physical and mental pain.  The (F)(6) aggravator was proved beyond a reasonable doubt.

### 2. Mitigating circumstances

¶34    During the penalty phase, "the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." A.R.S. § 13-703.01(G) (Supp. 2007). The mitigating circumstances must be proved by a preponderance of the evidence. A.R.S. § 13-703(C) (Supp. 2007).

¶35    McCray presented evidence of two non-statutory mitigators: difficult family history and mental health problems. Evidence of a third non-statutory mitigator, drug use, was also introduced during the penalty phase, although on cross-examination and rebuttal by the State. We consider each potential mitigator in turn.

### a. Difficult family history

¶36    A difficult family history is considered in mitigation, but its strength depends on whether the defendant can show it has a causal connection with the crime. *State v. Pandeli* ("*Pandeli II*"), 215 Ariz. 514, 532 ¶ 72, 161 P.3d 557, 575 (2007). Furthermore, a difficult childhood is given less weight when the defendant is older. *State v. Hampton*, 213 Ariz. 167, 185 ¶ 89, 140 P.3d 950, 968 (2006), *cert. denied*, 127 S. Ct. 972 (2007) (defendant was thirty at the time of the crime). McCray presented evidence that he was born to alcoholic parents; that as an infant he was briefly placed in a foster home after

15

being abandoned by his mother; that he was emotionally mistreated by his father and step-mother; and that he sometimes had troubled relations with his step-mother and her daughters. After his father divorced his step-mother, she raised him, paid his tuition for cosmetology school, and otherwise helped support him financially. McCray was twenty-eight years old when he murdered Cummins.

¶37    Here, although McCray proved he had a less-than-ideal childhood, he presented no evidence causally relating his childhood to his attack on Cummins. McCray urges this Court to reevaluate its rule that, especially when the defendant is older, a difficult childhood is given less mitigating weight than if the defendant can show a causal connection between the childhood and the crime. We decline to do so, but we reaffirm that we do consider evidence of a difficult childhood in mitigation even if no causal connection has been shown. *See State v. Newell*, 212 Ariz. 389, 406 ¶¶ 86-87, 132 P.3d 833, 850 (2006), *cert. denied*, 127 S. Ct. 663 (2006). In this case, we accord the factor little mitigating weight.

### b.    Mental health problems

¶38    This Court generally gives little mitigating weight to evidence of an undiagnosed mental illness. *See State v. Murdaugh*, 209 Ariz. 19, 35 ¶ 82, 97 P.3d 844, 860 (2004). This is especially true when the defendant fails to establish that

16

the mental illness caused the crime or inhibited his ability to appreciate the wrongfulness of his conduct or conform his conduct to the law. *Pandeli II*, 215 Ariz. at 533 ¶ 81, 161 P.3d at 576.

¶39    McCray did not offer expert testimony that he suffered from any mental illness. Instead, McCray's step-mother testified that he behaved unusually as a child, had trouble at school, and had undergone a brain scan indicating damage in the areas of comprehension and coordination. She said McCray had received no medical treatment as a child for this condition. One of his step-sisters said that he had occasional "blackout spells," when he forgot things that had happened the same day or appeared not to register what people were saying. Another step-sister said that she believed he was diagnosed with a seizure disorder. No tests or diagnostic results were introduced at trial.

¶40    His step-mother said McCray also often acted unusually when he was older. She said she was "almost sure he was on drugs at the time" of one incident, although one of her daughters said neither she nor her mother had ever seen him use drugs. A Phoenix police officer also said McCray acted bizarrely while in the county hospital and police custody four days before the murder, even though no drugs were found in his system and no tests were run for alcohol. On rebuttal at the

17

penalty phase, a detective testified that McCray had said he had used drugs during that general time period.

¶41     We conclude that McCray's evidence of an undiagnosed mental illness is entitled to little mitigating weight.

### c.   Drug use

¶42     Drug abuse can be considered a mitigating circumstance.  Absent evidence tying it to the crime, however, it is given minimal weight.  *State v. Velazquez*, 216 Ariz. 300, 314-15 ¶ 73, 166 P.3d 91, 105-06 (2007); *Newell*, 212 Ariz. at 406 ¶¶ 86-87, 132 P.3d at 850.

¶43     The evidence suggests that McCray abused drugs near the time of the murder.  This mitigating factor merits minimal weight, however, because there is no evidence he was using drugs when he killed Cummins.  Moreover, his actions in connection with the crime indicate that he recognized the wrongful nature of his conduct and took steps to conceal his identity.  In particular, he avoided leaving identifiable fingerprints and though he is Caucasian, he wrote "Black is all right" on a mirror in the apartment.

### 3.   Propriety of death sentence

¶44     In reviewing the propriety of the death sentence, this Court "consider[s] the quality and the strength, not simply the number, of aggravating and mitigating factors."  *State v. Glassel,* 211 Ariz. 33, 55 ¶ 93, 116 P.3d 1193, 1215 (2005).  The

18

(F)(2) and (F)(6) aggravators were established beyond a reasonable doubt. The mitigation evidence was insubstantial and does not warrant leniency.

## F. Issues preserved for federal review

¶45     To avoid preclusion, McCray raises twelve additional constitutional claims that he states have been rejected in previous decisions by the Supreme Court or this Court. The attached appendix lists the claims raised by McCray and the decisions he identifies as rejecting them.

## CONCLUSION

¶46     Because we affirm McCray's conviction and death sentence as modified to comply with A.R.S. § 13-704(B), we need not address the State's cross-appeal issues.

_____
                W. Scott Bales, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

19

**APPENDIX**

McCray raises the following claims to preserve them for federal review:

1.    The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. *See State v. Sansing*, 200 Ariz. 347 ¶ 46, 26 P.3d 1118 (2001), *vacated on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002); *State v. Rossi*, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985).

2.    Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. *See Sansing* at ¶ 46.

3.    The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *State v. Harrod*, 200 Ariz. 309 ¶ 59, 26 P.3d 492 (2001).

4.    The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection, and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  *See Harrod* at ¶ 65; *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992).

5.    Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove that the death penalty is appropriate.   Failure to require this violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  *See State v. Ring*, 200 Ariz. 267 ¶ 64, 25 P.3d 1139 (2001), *rev'd on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002).

6.    The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed. The statute requires the imposition of a death sentence if the jurors find one or more aggravating circumstances and no mitigating circumstances sufficiently substantial to call for life imprisonment. Furthermore, the death penalty serves no purpose that is not

adequately addressed by a sentence of life imprisonment. Therefore, it violates a defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution. *See State v. Pandeli ("Pandeli I")*, 200 Ariz. 365 ¶ 88, 26 P.3d 1136 (2001)*; State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

7.   A.R.S. § 13-703 provides no objective standard to guide the jurors in weighing aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *See Pandeli I* at ¶ 90.

8.   A.R.S. § 13-703 does not sufficiently channel the sentencing jurors' discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty.   The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, violating the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *See Pandeli I* at ¶ 90.

9.   Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. *See State v. Van Adams*, 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 (1999).

10.  A proportionality review of a defendant's death sentence is constitutionally required. *See State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

11. Arizona's death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 15 of the Arizona Constitution because it does not require multiple mitigating factors to be considered cumulatively or require the fact-finder to make specific findings as to each mitigating factor. *See Van Adams* at 423 ¶ 55, 984 P.2d at 31.

12. Arizona's death penalty statute is constitutionally deficient because it requires defendants to prove that their lives should be spared. *See State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).