SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-10-0052-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2004-007442-001 |
| ERIC BOYSTON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable John R. Ditsworth, Judge
The Honorable Joseph C. Welty, Judge

**AFFIRMED**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By    Kent E. Cattani, Chief Counsel, Criminal
           Appeals/Capital Litigation
           Laura Chiasson, Assistant Attorney General     Tucson
Attorneys for State of Arizona

DAVID GOLDBERG ATTORNEY AT LAW                      Fort Collins, CO
     By    David Goldberg
Attorney for Eric Boyston

_____

**P E L A N D E R**, Justice

¶1        A jury found Eric Boyston guilty of three first degree

murders and one count each of attempted first and second degree

murder.  He was sentenced to death for the murders and to prison

terms on the attempt convictions.  We have jurisdiction over

this automatic appeal under Article 6, Section 5(3) of the

Arizona Constitution and A.R.S. § 13-4031.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**¶2**      On the evening of February 1, 2004, Boyston was staying with his cousin, Shante.[2]  Boyston was unemployed and living alternately with Shante and his grandmother, Mary Boyston.  He argued that night with Shante and another cousin, Tonisha, about his living situation and was "very mad" that he had to live with his grandmother.  The next morning, Boyston's girlfriend, Alexandria Kelley, dropped him off at Mary's apartment.  Boyston saw Tonisha there and told her, "I'm hurt. I can't believe you did me like this.  You all going to regret this."

**¶3**      Alexandria returned to Mary's apartment complex later that day.  While sitting in Alexandria's car in a nearby parking lot, Boyston received a phone call, argued with the caller, and, after ending the call, told Alexandria to take him to meet the caller.  When she refused, Boyston said he should shoot her, pulled out a revolver, and shot at her but missed.  Alexandria got out of the car and asked him "what was going on, what was wrong with him.  And he just told [her] that he was going to

---

[1]      We cite the current version of statutes that have not materially changed since the events at issue.

[2]      The facts are presented in the light most favorable to sustaining the jury's verdicts.  *State v. Hardy*, 230 Ariz. 281, 284 ¶ 2 n.2, 283 P.3d 12, 15 n.2 (2012).

kill [her]." She tried to run away, but Boyston pulled out a different handgun and shot her in the chest, back, and side. She survived but is paralyzed from the waist down.

¶4 Boyston then jogged to Mary's apartment. Announcing that it was "time to take care of everyone who did me wrong," Boyston entered and shot Mary's son, Alexander Boyston, in the arm. After Alexander came out of the apartment and fell face down, Boyston fired two more shots into his back, killing him. Boyston also shot Mary three times inside the apartment, once in the side and twice in the back, killing her.

¶5 Boyston's great-aunt, Shirley Jones, came out of her nearby apartment unit and asked Boyston what he was doing. He responded, "Oh, I better get you, too," and then said, "You mother f***ers crossed me too many times." Boyston chased Shirley inside her apartment and shot her in the back. She eventually recovered from the gunshot wound.

¶6 After using his last bullet to shoot Shirley, Boyston returned to Mary's apartment and began fist fighting with Timothy Wright, a family friend. Just outside the apartment, Boyston took out a knife and stabbed Timothy nine times, one a fatal chest wound. Boyston fled but was arrested later that night.

¶7 Boyston was charged with three counts of first degree murder and two counts of attempted first degree murder. A jury

returned guilty verdicts on the first degree murder counts and on the charge of attempted first degree murder of Shirley. The jury found him not guilty of attempted first degree murder of Alexandria, but guilty of the lesser-included offense of attempted second degree murder.

¶8        The State alleged the serious offense conviction and multiple homicides aggravators, A.R.S. § 13-751(F)(2), (8), for the murders of Mary, Alexander, and Timothy, and the especial cruelty aggravator for the latter two, *id.* § 13-751(F)(6). The jury found each of those aggravators and determined that Boyston should be sentenced to death for each murder. The trial court also sentenced Boyston to consecutive prison terms for the attempted murder convictions.

## II. ISSUES ON APPEAL

### A. Mental retardation[3]

¶9        "Arizona law defines mental retardation as a condition bearing three hallmarks: '[1] significantly subaverage general intellectual functioning, existing concurrently with [2] significant impairment in adaptive behavior, [3] where the onset of the foregoing conditions occurred before the defendant

---

[3] After Boyston's trial, the legislature amended the pertinent statute, A.R.S. § 13-753, changing "mental retardation" to "intellectual disability." *See* 2011 Ariz. Sess. Laws, ch. 89, § 5 (1st Reg. Sess.). We use "mental retardation" in this opinion because that is the term employed by the parties and doctors in this case.

4

reached the age of eighteen.'" *State v. Grell* (*Grell III*), 231 Ariz. 153, 154-55 ¶ 5, 291 P.3d 350, 351-52 (2013) (alterations in original) (quoting A.R.S. § 13-753(K)(3)). Under A.R.S. § 13-753(G), Boyston was required to prove all three aspects of mental retardation by "clear and convincing evidence."

¶10 Before trial, Boyston's mitigation expert, Dr. Myla Young, administered the Wechsler Adult Intelligence Scale III (WAIS-III) and measured Boyston's intelligence quotient (IQ) at 65. On Boyston's motion, the superior court appointed Dr. D.J. Gaughan as a mental retardation prescreening expert pursuant to § 13-753(B). Dr. Gaughan administered the WAIS-III and measured Boyston's IQ at 59. Because the prescreen IQ was 75 or lower, the court, pursuant to § 13-753(D), appointed Dr. Denis Keyes as Boyston's expert and Dr. James Seward as the State's expert.

¶11 Dr. Keyes administered the Reynolds Intelligence Assessment Scales and measured Boyston's IQ at 64, in the "mentally defective range." Dr. Keyes made no finding on Boyston's adaptive skills "due to [Boyston's] fruitless attempts to malinger." Dr. Seward did not personally administer an IQ test, but relied on other assessments and collateral information to conclude that Boyston was "malingering intellectual deficit." Dr. Seward also determined that Boyston's adaptive functioning was not impaired and opined that he did not have mental retardation.

5

¶12     After holding a two-day evidentiary hearing and reviewing the parties' memoranda, the superior court accepted as credible Dr. Seward's opinions on both points and expressly determined that Boyston had "failed to satisfy his burden of proving by clear and convincing evidence that he has significant impairment in adaptive behavior with an onset prior to age 18." The court thus concluded that Boyston had not established mental retardation.

¶13     In challenging that determination, Boyston argues the superior court abused its discretion in three respects. Specifically, Boyston contends:  (1) the State's mental retardation expert, Dr. Seward, was not qualified under § 13-753(K)(2); (2) Dr. Seward failed to use currently accepted intellectual testing procedures, as required by § 13-753(E); and (3) Boyston proved by clear and convincing evidence that he is mentally retarded, and is thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and § 13-753(H).

### 1.   Qualifications of State's expert

¶14     Boyston argues the superior court erred in admitting the testimony of the State's expert, Dr. Seward, because he did not meet § 13-753(K)(2)'s requirements.  This Court interprets statutes de novo.  *State v. Arellano*, 213 Ariz. 474, 477 ¶ 9, 143 P.3d 1015, 1018 (2006).  "We review the decision to admit or exclude [expert testimonial] evidence for abuse of discretion."

6

*State v. Grell* (*Grell II*), 212 Ariz. 516, 528 ¶ 55, 135 P.3d 696, 708 (2006).

**¶15**     After a prescreening evaluation indicates a need for further assessment of mental retardation, § 13-753(D) directs the trial court to "appoint one expert in intellectual disabilities nominated by the state and one expert in intellectual disabilities nominated by the defendant." An "expert in intellectual disabilities" is defined as "a psychologist or physician licensed pursuant to title 32, chapter 13, 17 or 19.1 with at least five years' experience in the testing or testing assessment, evaluation and diagnosis of intellectual disabilities." A.R.S. § 13-753(K)(2) (footnote omitted).

**¶16**     Boyston does not contest that Dr. Seward was properly licensed, but contends that he lacked the requisite experience. The record, however, rebuts this contention:

> [PROSECUTOR]: So during the time you have been in Arizona, have you been doing testing and assessments and diagnoses of retardation?
>
> [DR. SEWARD]: Yes. It came up -- it would come up occasionally with my employment in the county for the Rule 11 process.
>
> . . . .
>
> [PROSECUTOR]: How long have you been doing testing, testing/assessment, evaluation, diagnosis of mental retardation?
>
> [DR. SEWARD]: Well, on and off since I was licensed in 1991.

. . . .

> [DEFENSE COUNSEL]: So what you said on direct is, that in your capacity as an appointed psychologist to determine competency and even state of mind of an accused at the time of the offense, you have, as part of that evaluation, considered possible mental retardation as an Axis II diagnosis. Is that what your testimony is?

> [DR. SEWARD]: That's correct. Although more competency than state of mind at the time of the offense.

. . . .

> [DEFENSE COUNSEL]: The only experience . . . you have with evaluating children . . . with mental retardation was when you were doing consulting work with the St. Edmond's home for children in 1991 [to 2002]?

> [DR. SEWARD]: Correct.

¶17 Viewed in the light most favorable to upholding the superior court's ruling, the record supports a finding that Dr. Seward had at least five years' experience not only in testing, but also in evaluation and diagnosis of intellectual disabilities. *See State v. Keener*, 110 Ariz. 462, 465–66, 520 P.2d 510, 513–14 (1974) ("Whether a witness is qualified as an expert witness rests in the sound discretion of the trial court, and that decision will not be reviewed unless there is a showing of abuse of discretion.").

¶18 Boyston suggests that § 13-753(K)(2) requires not only five years' experience, but also regular — as opposed to occasional — testing, evaluation, and diagnosis during the five-

8

year period.  But the statute only requires "five years' experience" and does not specify any additional requirements for establishing a minimum level of expertise.  Consistent with the general standard for admissibility of expert testimony, we find that the extent of Dr. Seward's experience goes to the weight of his testimony, not its admissibility.  *State v. Davolt*, 207 Ariz. 191, 210 ¶ 70, 84 P.3d 456, 475 (2004); *see also* Ariz. R. Evid. 702 (2009).[4]

¶19      Dr. Seward indicated that he had occasionally performed testing, evaluation, and diagnoses of mental retardation for at least fifteen years, and on average did so at least once a week from 1991 to 2002.  Although he acknowledged that this was his first mental retardation evaluation in a capital case, the statute does not require prior experience in capital cases.  Dr. Seward's level of experience satisfies § 13-753(K)(2).

### 2.    Evaluation methods used by State's expert

¶20      Boyston next argues the superior court erred in admitting Dr. Seward's testimony because he failed to use currently accepted intellectual testing procedures.  We disagree.

---

[4]      We express no opinion on what procedural or substantive effect, if any, current Evidence Rule 702, as amended effective January 1, 2012, might have had on Dr. Seward's qualifications or permissible testimony.

9

**¶21** Section 13-753(B) requires a prescreening expert "to determine the defendant's intelligence quotient using current community, nationally and culturally accepted intelligence testing procedures." *See State ex rel. Thomas v. Duncan*, 222 Ariz. 448, 451 ¶ 17, 216 P.3d 1194, 1197 (App. 2009) (holding that § 13-753(B) requires a prescreening expert to personally conduct an IQ test and not solely rely on one previously administered). In contrast, later-appointed experts such as Dr. Seward must "examine the defendant using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has an intellectual disability," and then submit to the trial court a written report "that includes the expert's opinion as to whether the defendant has an intellectual disability." A.R.S. § 13-753(E).

**¶22** Boyston concedes that no statute expressly required Dr. Seward to administer an IQ test, but argues that currently accepted testing procedures required Dr. Seward to either personally conduct a valid IQ test or, at a minimum, rely on a valid IQ test. He asserts that the only IQ test Dr. Seward relied on was the discredited Culture Fair test that Boyston took in 2000.

**¶23** Dr. Seward acknowledged that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)

10

states that individualized testing is always required "to make the diagnosis of mental retardation." But he testified that he did not need to personally administer additional IQ testing because Boyston had recently been given three individualized IQ tests. Dr. Seward further opined that "interpret[ing] the tests that others had given . . . [was] satisfactory with respect to the requirement of individualized testing." Boyston did not introduce any evidence to rebut Dr. Seward's testimony that he had followed currently accepted testing procedures related to IQ testing.

¶24 Regarding the results of the various IQ tests administered by others, Dr. Seward gave the most credence to the Culture Fair test, which Boyston argues is not a valid IQ test. On that test, Boyston obtained a weighted IQ score of 85, "a level of functioning" described in the testing notes as "dull normal intelligence." Dr. Seward considered the results of the Culture Fair test "noteworthy" because Boyston "did not have the same incentive to appear impaired" when that test was administered in 2000, before he committed the crimes at issue here.

¶25 Dr. Seward acknowledged that he did not know the details of the Culture Fair testing and that he was unable to review any raw data from that test. But Boyston did not introduce any evidence below to show that the Culture Fair test

11

deviated from currently accepted tests or that Dr. Seward inappropriately relied on it. On appeal, Boyston cites several cases in which courts gave minimal weight to that test and other similar tests, but those cases do not hold that an expert falls below currently accepted standards by relying on such tests.[5] Moreover, the records in those cases, unlike this one, contained expert testimony that generally explained the limitations of such tests.

**¶26** Although Dr. Seward relied on the Culture Fair test, he also referred to and analyzed the underlying data from the IQ tests administered by Dr. Young and Dr. Gaughan, with whose opinions he disagreed. Given his conclusions that Boyston was malingering on those IQ tests and that no other information

---

[5]     Boyston quotes from *Goetsch v. State*, 172 N.W.2d 688, 692 (Wis. 1969), which recites an expert's description of the Culture Fair test. Boyston also inappropriately quotes an unreported federal district court case in which the experts who testified had agreed that the Culture Fair test was not a reliable measure of intellectual function. But Boyston cannot establish through case law matters on which no expert testimony was offered below.

Boyston also quotes from *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007), which explained that the lower court had rejected screening tests used in the prison system. But the weighing of evidence by the trial court in that case is irrelevant to our review of whether the trial court in this case abused its discretion, as "[t]he trial judge has broad discretion in determining the weight and credibility given to mental health evidence." *Grell II*, 212 Ariz. at 528 ¶ 58, 135 P.3d at 708 (quoting *State v. Doerr*, 193 Ariz. 56, 69 ¶ 64, 969 P.2d 1168, 1181 (1998)).

12

revealed that Boyston had subaverage intellectual functioning, Dr. Seward determined that no additional IQ testing was necessary. Boyston failed to show that Dr. Seward's determination was invalid or suspect because he did not adhere to currently accepted testing procedures. Accordingly, the superior court did not abuse its discretion by admitting and relying on Dr. Seward's testimony that Boyston did not demonstrate significantly subaverage intellectual functioning. *See* A.R.S. § 13-753(K)(5).

**¶27** Boyston also argues that Dr. Seward failed to follow currently accepted testing procedures by not performing formal evaluations of Boyston's adaptive functioning and by focusing on his strengths rather than his deficits. As with intellectual functioning, however, Boyston introduced no evidence to rebut Dr. Seward's testimony that he followed currently accepted testing procedures related to adaptive behavior. Although Boyston's mental retardation expert, Dr. Keyes, administered the Adaptive Behavior Assessment System, Second Edition (ABAS-II) test to Boyston, Dr. Seward explained that it is difficult to measure adaptive functioning when the individual is incarcerated, and pointed to the testing criteria in the ABAS-II manual, which requires that the examiner have frequent, long-term contact with the individual. Dr. Seward instead relied on school and criminal records, interviews with those who knew

13

Boyston, and recorded jail telephone conversations.

¶28    In challenging Dr. Seward's opinion on adaptive behavior, Boyston relies heavily on information in the DSM-IV and the American Association on Intellectual and Developmental Disabilities (AAIDD, formerly AAMR) manual. Both manuals suggest the examiner should investigate numerous sources over an extended time frame, and the DSM-IV also recommends consideration of adaptive functioning measures. But Boyston did not present this evidence below or argue that it established currently accepted procedures for assessing adaptive functioning; and Dr. Seward considered information from a wide variety of sources.

¶29    Boyston also points to various authorities, including the DSM-IV, the AAIDD manual, and medical journal articles, that indicate that those with mental disabilities have both strengths and deficits, and that an evaluating expert should focus on the presence of deficits. He takes issue with the weight Dr. Seward gave to Boyston's jail conversations and on his own interviews with Alexandria and her father, arguing that Dr. Seward violated current standards by focusing on strengths while ignoring Boyston's deficits. As with adaptive behavior testing, however, Boyston did not introduce below the information to which he now points as evidence of current standards; and again, Dr. Seward analyzed Boyston's adaptive behavior in many areas and from many

14

sources.

**¶30** In sum, although Dr. Seward did not personally administer an IQ test or an adaptive functioning assessment, he testified without contradiction that he followed current standards. No evidence showed that his evaluation methods violated "current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures." A.R.S. § 13-753(E). The superior court did not abuse its discretion in admitting and relying on Dr. Seward's testimony.

### 3. Trial court's ruling on mental retardation

**¶31** Finally, Boyston challenges the superior court's ruling that he did not prove mental retardation, arguing that it was proven by clear and convincing evidence. We have no basis for overturning the court's ruling, however, because Boyston failed to establish mental retardation by even a preponderance of the evidence. *Cf. Grell III*, 231 Ariz. at 160 ¶¶ 35-36, 291 P.3d at 357 (holding that *Atkins* barred the execution of a defendant who established at the penalty phase his mental retardation by a preponderance of the evidence).

### a. Intellectual functioning

**¶32** "Significantly subaverage general intellectual functioning" is defined as "a full scale intelligence quotient of seventy or lower." A.R.S. § 13-753(K)(5). A rebuttable

15

presumption of intellectual disability arises when the trial court determines that the defendant's IQ is 65 or lower. *Id.* § 13-753(G). Boyston contends for the first time on appeal that because the IQ tests administered by Drs. Young, Gaughan, and Keyes all indicated his IQ was 65 or lower, he was entitled to the rebuttable presumption. But even if such a presumption arose, "[t]he presumption of mental retardation based on the IQ scores vanishes . . . if the State presents evidence that calls into question the validity of the IQ scores or tends to establish that [the] defendant does not otherwise meet the statutory definition of mental retardation." *Arellano*, 213 Ariz. at 478 ¶ 13, 143 P.3d at 1019 (internal quotation marks omitted). "At that point, the IQ scores serve as evidence of mental retardation, to be considered by the trial court with all other evidence presented." *Id.*

¶33 The evidence relating to Boyston's intellectual functioning was conflicting. Dr. Seward's opinion that Boyston was malingering, Boyston's school and prison records, and testimony from his third-grade teacher (Merilee Wortham) and maternal aunt (Romla Robinson) arguably "call[ed] into question the validity of the IQ scores" on which Boyston relies. *Id.* But even if Boyston established the intellectual deficit element of mental retardation, it would not change the result unless he also satisfied the other statutory prerequisites, discussed

16

below.

### b. Adaptive behavior

**¶34** "Adaptive behavior" is defined as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13-753(K)(1). Although the DSM-IV defines impairments in adaptive functioning based on deficits in two areas, the DSM-IV definition is not the same as the statutory definition. *Grell II*, 212 Ariz. at 529 ¶ 62, 135 P.3d at 709. The statute, by contrast, "requires an overall assessment of the defendant's ability to meet society's expectations of him." *Id.*; *see also Grell III*, 231 Ariz. at 155 ¶ 7, 291 P.3d at 352.

**¶35** Boyston contends that the superior court ignored academic records and adaptive functioning measurements that showed impairments in adaptive behavior and instead "cherry picked" evidence that showed his strengths. The court gave significant weight to jail telephone conversations in which Boyston set up fraudulent "burn line" accounts for other inmates, allowing callers to make collect calls without the call recipient being charged. In other conversations, Boyston helped his daughter with math homework, told his girlfriend he was reading *The Autobiography of Miss Jane Pitman*, explained how to do certain home repairs, and talked about keeping himself and

17

his cell clean. The court found that the phone conversations "represent[ed] a true day to day picture of [Boyston's] cognitive abilities and behaviors," and determined that "there was no credible evidence in the record to establish mental retardation." Boyston cites a district court case that found jail telephone calls largely irrelevant to a defendant's adaptive functioning. *See United States v. Davis*, 611 F. Supp. 2d 472, 494 (D. Md. 2009). But, as the finder of fact, the trial court "has broad discretion in determining the weight and credibility given to mental health evidence." *Grell II*, 212 Ariz. at 528 ¶ 58, 135 P.3d at 708 (internal quotation marks omitted).

**¶36** The record here supports the conclusion that Boyston did not prove substantial impairment in adaptive functioning by even a preponderance of the evidence, let alone by clear and convincing evidence, the statutory standard of proof the superior court applied. Dr. Seward's opinion was based on Boyston's school, health, and prison records, jail phone calls, interviews of Boyston's acquaintances, and other sources, and he opined that Boyston "demonstrates an intact ability to adapt to his current environment." Significantly, Boyston's own mental-retardation expert, Dr. Keyes, declined to make a finding on Boyston's adaptive skills "due to his fruitless attempts to malinger," and the prescreening expert, Dr. Gaughan, did not

18

evaluate Boyston's adaptive behavior.

¶37    Boyston relies heavily on portions of the testimony of his aunt and third-grade teacher (Robinson and Wortham), but the trial court determines how much weight and credibility to give conflicting testimony.  Because the record supports the superior court's factual findings, we defer to them.  Given the paucity of evidence, by expert testimony or otherwise, that Boyston had significant impairments in adaptive behavior, we have no basis for overturning the court's determination that Boyston failed to establish that prerequisite.

### c.    Onset before age eighteen

¶38    Boyston argues the superior court ignored the evidence that Boyston's mental retardation began before age eighteen, pointing again to the testimony of Wortham and Robinson.  But sufficient evidence supported the court's conclusion that Boyston did not have substantial deficits in either intellectual functioning or adaptive behavior before age eighteen.  Accordingly, the court did not abuse its discretion in rejecting Boyston's mental-retardation claim.

## B.   Exclusion of jurors for cause

¶39    Over Boyston's objection, the trial court struck Jurors 51 and 54 for cause.  Boyston argues the trial court erred in excluding those jurors because of their views on the death penalty, violating his Sixth, Eighth, and Fourteenth

Amendment rights. This Court reviews a trial court's decision to strike a potential juror for cause for abuse of discretion, *State v. Jones*, 197 Ariz. 290, 302 ¶ 24, 4 P.3d 345, 357 (2000), because trial judges are in the best position to "assess the demeanor of the venire, and of the individuals who compose it," *Uttecht v. Brown*, 551 U.S. 1, 9, 20 (2007).

**¶40** "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is entitled to an impartial jury." *State v. Velazquez*, 216 Ariz. 300, 306 ¶ 14, 166 P.3d 91, 97 (2007). Jurors who merely "voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction" may not be struck for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (finding Sixth Amendment violation). A trial court may remove a prospective juror for cause when his or her views about capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

### 1. Juror 51

**¶41** Juror 51 indicated on the initial questionnaire that she was a Catholic who was "generally not for the death penalty" and wrote that "[m]orally it is tough to execute or be part of a process that kills a human soul." But she also wrote that she

was "not strongly opinionated about it" and would be able to consider the evidence and follow the law.

¶42      During voir dire, Juror 51 indicated that she was "pretty strongly tied to church" and acknowledged that the "Catholic Church is against the death penalty." In describing the extent to which her religious beliefs would influence her ability to assess mitigation evidence, she stated, "I will be influenced by the belief of having sanctity and reverence for life." She also acknowledged that it would be a "big struggle" to disregard her religious beliefs in determining the appropriate penalty.

¶43      Although Juror 51 indicated at times that she could set aside her religious beliefs about the death penalty, the judge must consider "the entirety of [the juror's] answers." *State v. Lynch*, 225 Ariz. 27, 35 ¶ 28, 234 P.3d 595, 603 (2010). The entirety of Juror 51's answers indicates that she was highly conflicted about imposing the death penalty. We have upheld strikes for cause of similar jurors who "equivocat[e] about whether [they] would take [their] personal biases in the jury room sufficient to substantially impair [their] duties." *State v. Ellison*, 213 Ariz. 116, 137 ¶ 89, 140 P.3d 899, 920 (2006) (internal quotation marks omitted). The trial court did not abuse its discretion in striking Juror 51 for cause.

    **2.   Juror 54**

21

¶44     When asked on the initial questionnaire to list any time she had been arrested, charged, or convicted of any crime other than minor traffic violations, Juror 54 responded that she had been convicted of counterfeiting.  The prosecutor later informed the court and Boyston's counsel that a criminal records check on Juror 54 revealed she had additional, and more recent, arrests for drug possession and aggravated assault that she had not disclosed.

¶45     The trial court granted the State's motion to strike, pointing to all the discrepancies in her disclosure and accounts of her criminal history and stating that "[a]ll of this causes the Court substantial concern about her credibility, her ability to abide by the court's instructions, and frankly my ability to assess any of the answers she has provided in the voir dire process in order that I and the parties may evaluate her as an adequate juror."  In so ruling, the court did not mention Juror 54's personal views on the death penalty.

¶46     Boyston contends the court "decided by inference that her answers . . . on the death penalty . . . were not truthful because she forgot to put down an arrest from 24 years earlier," and thus asserts that Juror 54 "was excused based upon the court's belief of her views on the death penalty."  Trial courts, however, "are permitted to determine a potential juror's credibility when deciding whether to strike a juror for cause."

*State v. Glassel*, 211 Ariz. 33, 48 ¶ 50, 116 P.3d 1193, 1208 (2005).

**¶47** The trial court's concern with Juror 54's credibility, and more broadly her ability to follow the court's instructions, created doubt that the juror could render a fair and impartial verdict. *See State v. Cota*, 229 Ariz. 136, 147 ¶ 40, 272 P.3d 1027, 1038 (2012) ("The trial court should excuse a juror '[w]hen there is reasonable ground to believe that a juror cannot render a fair and impartial verdict.'" (alteration in original) (quoting Ariz. R. Crim. P. 18.4(b))). The trial court did not abuse its discretion in striking Juror 54 for cause.

**C. Precluding evidence of intoxication to rebut premeditation**

**¶48** Boyston contends the trial court erred by not allowing him to present evidence of his alleged phencyclidine (PCP) intoxication at the time of the murders to rebut the State's evidence of premeditation. He argues that A.R.S. § 13-503 does not apply to premeditation or, to the extent it applies, it is unconstitutional. We review de novo issues of statutory interpretation and constitutionality. *State v. Dann* (*Dann II*), 220 Ariz. 351, 369 ¶ 96, 207 P.3d 604, 622 (2009).

**¶49** Section 13-503 states that "[t]emporary intoxication . . . does not constitute insanity and is not a defense for any criminal act or requisite state of mind." Boyston argues that premeditation is neither a "criminal act" nor a "requisite state

23

of mind" under § 13-503, and therefore the statute does not preclude consideration of voluntary intoxication on the issue of premeditation.  He points to A.R.S. § 13-105(10), which defines "culpable mental state" as including "intentionally, knowingly, recklessly or with criminal negligence," but not premeditation. Premeditation is defined separately in A.R.S. § 13-1101(1):

> "Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection.  Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

*See also State v. Thompson*, 204 Ariz. 471, 478-80 ¶¶ 26-33, 65 P.3d 420, 427-29 (2003).

**¶50** Although premeditation is not included in the statutory enumeration of "culpable" mental states under § 13-105(10), it is a required element of first degree murder under § 13-1105(A)(1) and is part of the requisite *mens rea* of that offense.  *See Schad v. Arizona*, 501 U.S. 624, 637 (1991) (noting that "under [Arizona] law, premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element"); *see also* A.R.S. § 13-101 (stating that one of the general purposes of the criminal code is "[t]o define the act or omission and the accompanying mental state which constitute each offense").

24

**¶51** Consistent with that view, several of our cases have referred to premeditation as a mental state. In *Thompson*, we stated that premeditation "is [the] *mental state* that distinguishes between first and second degree murder." 204 Ariz. at 478 ¶ 27 n.6, 65 P.3d at 427 n.6 (emphasis added); *see also Evanchyk v. Stewart*, 202 Ariz. 476, 479 ¶ 10, 47 P.3d 1114, 1117 (2002) ("Any agreement with another to kill a third person constitutes premeditation, the mental state that exists under Arizona law whenever the intention to kill precedes the killing by a length of time to permit reflection." (internal quotation marks omitted)); *State v. Wood*, 180 Ariz. 53, 62, 881 P.2d 1158, 1167 (1994) ("The disputed trial issues were Defendant's *motive* and *mental state* — whether Defendant acted with premeditation or as a result of a sudden impulse.").

**¶52** Because premeditation is a mental state and part of the *mens rea* element of premeditated first degree murder under § 13-1105(A)(1), it is thus a "requisite state of mind" of that offense. Section 13-503 therefore precludes evidence of voluntary intoxication when considering premeditation.[6] *Cf. State v. Kiles*, 222 Ariz. 25, 33 ¶ 29, 213 P.3d 174, 182 (2009) (rejecting argument under former § 13-503 that defendant "may

---

[6] Boyston also argues, in a footnote, that the trial court erred in precluding evidence of his voluntary intoxication during the aggravation phase. But he never sought to present evidence of his intoxication during that phase.

not have reflected on his decision to [kill the victim] because he was voluntarily intoxicated").

**¶53** Just as Boyston's statutory analysis is flawed, so is his reliance on *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981). In that case, we held that the trial court erred by not admitting under Evidence Rule 404(a)(1) relevant character-trait testimony that the defendant reacted impulsively to stress, evidence proffered to rebut the premeditation element of first degree murder. *Id.* at 34–35, 628 P.2d at 582–83; *see State v. Mott*, 187 Ariz. 536, 544, 931 P.2d 1046, 1054 (1997) ("[Christensen] attempted to show that he possessed a character trait of acting reflexively in response to stress."). *Christensen* is inapposite because no such character trait is at issue here.

**¶54** Boyston also asserts three reasons why § 13–503 is unconstitutional if interpreted to preclude consideration of voluntary intoxication on the issue of premeditation. We find none persuasive.

**¶55** First, Boyston argues § 13–503 deprives him of his fundamental right to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete

26

defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted).

¶56 But in *Montana v. Egelhoff*, the United States Supreme Court squarely rejected the argument that a state law violated due process by providing that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense," Mont. Code Ann. § 45-2-203 (1995). 518 U.S. 37, 51 (1996) (Scalia, J., plurality opinion); *see id.* at 58-59 (Ginsburg, J., concurring in judgment) ("Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend a 'fundamental principle of justice,' given the lengthy common-law tradition [prohibiting the voluntary intoxication defense], and the adherence of a significant minority of the States to that position today."). Like Montana's legislature, the Arizona Legislature has defined the *mens rea* element of first degree premeditated murder such that voluntary intoxication is not a defense. That legislative decision does not violate Boyston's constitutional right to present a complete defense.

¶57 Second, Boyston asserts that excluding consideration of voluntary intoxication violates his right to equal protection. He seems to argue that applying § 13-503 to premeditation eviscerates the distinction in the classifications of those facing the "most severe punishment" of premeditated

first degree murder and those charged with lesser offenses. This argument lacks merit, as § 13-503 does not relieve the state of the burden to prove premeditation in premeditated first degree murder cases, *see Thompson*, 204 Ariz. at 478-80 ¶¶ 26-33, 65 P.3d at 427-29, and there is a rational basis for imposing a greater punishment on those who have reflected before committing a murder, *see United States v. LaFleur*, 971 F.2d 200, 212 (9th Cir. 1991) (rejecting equal protection challenge because "[t]here clearly exist rational reasons for Congress to prescribe different penalties" under two federal statutes that each punish murder, as the statutes "address crimes with different elements and different ranges of culpability").

¶58 Finally, Boyston argues § 13-503 violates the Eighth Amendment to the extent it precludes evidence of voluntary intoxication. But the Eighth Amendment generally imposes limitations on sentencing and the imposition of the death penalty, not the determination of guilt. *See McCleskey v. Kemp*, 481 U.S. 279, 305-06 (1987). The notable exception is that a jury, in determining guilt in a capital case, must be given the option of convicting the defendant of a lesser offense than the death-eligible offense. *See Beck v. Alabama*, 447 U.S. 625, 642-43 (1980). Here, that option existed because the jury was instructed on second degree murder. *Beck*'s reasoning does not extend to this context, as precluding evidence of voluntary

28

intoxication does not raise concerns that a jury will improperly find a defendant guilty of a death-eligible offense. In addition, Boyston could and did present evidence of his intoxication in the penalty phase. Therefore, the preclusion in the guilt phase of voluntary intoxication evidence, as directed by § 13-503, does not violate the Eighth Amendment.

## D. **Sufficiency of evidence of premeditation**

**¶59** Boyston argues that the trial court erroneously denied his motion for a judgment of acquittal under Arizona Rule of Criminal Procedure 20 because the State failed to present substantial evidence that he killed Mary and Timothy with premeditation. Boyston concedes there was sufficient evidence that he killed Alexander with premeditation. We review de novo a trial court's ruling on a Rule 20 motion. *State v. West*, 226 Ariz. 559, 562 ¶ 15, 250 P.3d 1188, 1191 (2011).

**¶60** A conviction for premeditated first degree murder must be supported by substantial evidence of premeditation, *State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995), and this Court views all evidence "in the light most favorable to sustaining the conviction and [resolves] all reasonable inferences . . . against the defendant," *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). To prove premeditation, the state must establish actual reflection and more than mere passage of time, but it may do so with "all the

29

circumstantial evidence at its disposal in a case." *Thompson*, 204 Ariz. at 478–80 ¶¶ 29, 31, 33, 65 P.3d at 427–29.

**¶61** Boyston asserts that "no one testified exactly what occurred in the apartment or what they heard before or during the shooting," other than hearing the gunshots, thus leaving the jury to speculate whether he killed his grandmother with premeditation. The record, however, contains sufficient evidence to support a finding of premeditation. Boyston was upset the night before the murders because his cousin, Tonisha, would not let him stay with her and he had to live with Mary. While at Mary's apartment the following morning, Boyston told Tonisha, "I can't believe you did me like this. You all going to regret this."

**¶62** On this record, the jury reasonably could find that Boyston formed his intent to kill Mary when he threatened Tonisha personally and, by reference, others. His actions in carrying weapons to the crime scene and jogging directly to Mary's apartment immediately after shooting Alexandria also support an inference that he had decided to kill Mary. *See State v. Ovante*, 231 Ariz. 180, 185 ¶ 16, 291 P.3d 974, 979 (2013) (carrying of a loaded gun to murder scene is circumstantial evidence of premeditation). Finally, his statement that "[i]t's time to take care of everyone who did me wrong" as he walked into Mary's apartment supports a conclusion

that he reflected on his decision to kill.[7]

**¶63**     As for Timothy's murder, Boyston contends that the evidence supports only a conclusion that a fist fight escalated to the point of his stabbing Timothy in the heat of the moment. Viewed in the light most favorable to sustaining the jury's verdict, however, the record supports a reasonable inference that Boyston intended, and had reflected on his decision, to kill all those "who did [him] wrong." Given that Timothy lived with Alexander and Mary, where Boyston also at times stayed, and that Boyston was unhappy about his living situation, the jury could reasonably infer that Timothy was one of those Boyston thought "did him wrong."

**¶64**     Boyston counters that if that were true, he would have killed Timothy when he killed Alexander and Mary, before he left to shoot Shirley. But rather than relying on such speculation, we must view the record and any reasonable inferences in the light most favorable to sustaining the jury's verdict. Given

---

[7]     Boyston's reliance on *State v. Moore*, 222 Ariz. 1, 15 ¶ 70, 213 P.3d 150, 164 (2009), and *State v. Dann* (*Dann I*), 205 Ariz. 557, 566 ¶ 20, 74 P.3d 231, 240 (2003), is misplaced. Those cases reversed convictions not because there was insufficient evidence of reflection, but because the jury was improperly instructed that premeditation could be shown by mere passage of time and the evidence of premeditation was not so overwhelming that we could find the error harmless. *Moore*, 222 Ariz. at 14–15 ¶¶ 66–67, 70, 213 P.3d at 163–64; *Dann I*, 205 Ariz. 565–66 ¶¶ 17, 20, 74 P.3d at 239–40. Here, the jury was properly instructed on premeditation.

31

that Boyston returned to Mary's apartment after shooting Shirley, the jury could reasonably find that Boyston had planned to kill Timothy, but was briefly interrupted when he saw and chased Shirley. In sum, sufficient evidence supports the jury's finding that Boyston killed Timothy with premeditation.

**E.   Failure to give manslaughter instruction**

¶65    For each of the three first degree murder counts, the trial court also instructed the jury on the lesser-included offense of second degree murder. Regarding the killing of Timothy, Boyston argues the court erred by not also instructing the jury on the lesser-included offense of manslaughter by sudden quarrel or heat of passion. Boyston did not request a manslaughter instruction, nor did he object to the absence of one in the trial court's proposed jury instructions. We therefore review this issue for fundamental, prejudicial error. *State v. Bearup*, 221 Ariz. 163, 168 ¶ 21, 211 P.3d 684, 689 (2009).

¶66    "When a jury is given a choice between first-degree murder and second-degree murder and convicts on first-degree murder, it has necessarily rejected manslaughter," and "any purported error in failing to give a manslaughter instruction was harmless." *State v. Nelson*, 229 Ariz. 180, 186 ¶ 24, 273 P.3d 632, 638 (2012); *see also Cota*, 229 Ariz. at 150 ¶ 66, 272 P.3d at 1041. Given the jury's finding of guilt on the first

32

degree murder charges, no error, fundamental or otherwise, resulted from the lack of an instruction on manslaughter.

## F.   Refusal to instruct on ineligibility for parole

¶67     Boyston requested a jury instruction that if sentenced to life, he would be sentenced to natural life and would "never be eligible to be released from prison for any reason for the rest of his life."  The trial court denied that request and instead instructed the jury that, if sentenced to life, Boyston could either be sentenced to "natural life" or "life without the possibility of release until 25 calendar years in prison are served."

¶68     Citing *Simmons v. South Carolina*, 512 U.S. 154 (1994), Boyston argues the trial court violated his due process rights by not instructing the jury that Arizona law precluded him from being considered for parole after serving twenty-five years if sentenced to life in prison.  But Boyston's proffered instruction referred more broadly to any form of release or commutation of sentence, and we have previously rejected arguments similar to his.  *Cota*, 229 Ariz. at 151 ¶ 75, 272 P.3d at 1042 ("[The defendant's] argument . . . conflates parole and release.  [He] would have been eligible for other forms of release, such as executive clemency, if sentenced to life with the possibility of release.").   The court's instruction accurately stated the law.  *State v. Hargrave*, 225 Ariz. 1, 14–

33

15 ¶ 53, 234 P.3d 569, 582–83 (2010) ("[The defendant's] argument that he is not likely to actually be released does not render the instruction legally incorrect.").

### III. REVIEW OF DEATH SENTENCES

**¶69** We review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion. A.R.S. § 13-756(A). "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

### A. Applicable standard of review

**¶70** Boyston first argues that we should apply a less deferential abuse of discretion standard as set forth in *State v. Chapple*, 135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983). We recently rejected the same argument in *Cota*, 229 Ariz. at 153 ¶ 91, 272 P.3d at 1044.

### B. Constitutionality of A.R.S. § 13-756(A)

**¶71** Boyston also contends that the abuse of discretion standard under § 13-756(A) violates the Eighth and Fourteenth Amendments because the United States Supreme Court mandates "meaningful" appellate review of death sentences. *See Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). We have previously

34

rejected similar constitutional challenges to the statute. *Nelson*, 229 Ariz. at 191 ¶ 50, 273 P.3d at 643.

## C. Aggravating circumstances

**¶72** The jury found as to each first degree murder that Boyston had been convicted of a serious offense, A.R.S. § 13-751(F)(2), and was convicted of one or more other homicides that were committed during the commission of the offense, *id.* § 13-751(F)(8). The jury also found, as to the murders of Alexander and Timothy, that Boyston committed the offenses in an especially cruel manner. *Id.* § 13-751(F)(6). Boyston does not contest the (F)(2) finding, which was supported by his convictions of attempted second degree murder of Alexandria and attempted first degree murder of Shirley, but he challenges the (F)(8) and (F)(6) findings.

### 1. (F)(8) Aggravator

**¶73** To prove the (F)(8) aggravator, the state must establish beyond a reasonable doubt that the homicides took place during a "continuous course of criminal conduct" and were "temporally, spatially, and motivationally related." *State v. Armstrong* (*Armstrong III*), 218 Ariz. 451, 464 ¶ 67, 189 P.3d 378, 391 (2008) (quoting *State v. Prasertphong*, 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003)).

**¶74** The murders all occurred within minutes of each other in or just outside Mary's apartment; thus, they are temporally

35

and spatially related. Boyston, however, contends that there is no evidence from which the jury could conclude the three murders were motivationally related. We disagree.

¶75 The jury could reasonably conclude that Boyston committed all three murders for the reason he expressed when he entered Mary's apartment immediately before the killings: "to take care of everyone who did [him] wrong." He also mentioned this motivation earlier that day, exclaiming that all those he thought had mistreated him would regret it. When he later saw Shirley, he said, "Oh, I better get you, too," and as he chased and shot her, he further expressed his motivation for the offenses, stating, "You mother f***ers crossed me too many times."

¶76 Boyston then returned to Mary's apartment and stabbed Timothy to death. The jury could reasonably conclude that Boyston killed Timothy because he was among those Boyston thought "did him wrong." Boyston argues Timothy's murder was motivated by defending himself from Timothy, who was fighting him. But the jury found Boyston guilty of premeditated first degree murder, and thus necessarily rejected the theory that Boyston was defending himself or acting in the heat of passion. As such, the jury did not abuse its discretion in finding the (F)(8) aggravator.

2. (F)(6) Aggravator

**¶77**      To show that a murder is especially cruel, the state must "prove[] beyond a reasonable doubt that 'the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur.'"  *State v. Snelling*, 225 Ariz. 182, 188 ¶ 25, 236 P.3d 409, 415 (2010) (quoting *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)).  "The entire murder transaction, not just the final act, may be considered."  *State v. McCray*, 218 Ariz. 252, 259 ¶¶ 31, 33, 183 P.2d 503, 510 (2008).

### a.   Boyston's alleged PCP intoxication

**¶78**      As to both Alexander and Timothy, Boyston argues that their suffering was not objectively foreseeable because he was in a "PCP blackout" and a "dissociative state which resulted in delusions, hallucinations and psychosis."  In support, Boyston cites evidence of PCP intoxication introduced in the penalty phase.  But Boyston did not introduce any evidence of PCP intoxication during the aggravation phase.  Although some evidence presented in the guilt phase suggested that Boyston was "super high" from smoking PCP the night before the murders, and the jury could properly consider that evidence in reaching its aggravation-phase verdicts, *see* A.R.S. § 13-752(E), (I), several witnesses testified that he seemed normal at the time of the murders.  We cannot conclude the jury abused its discretion in finding the (F)(6) aggravator.

### b. Murder of Alexander

¶79    George Newton testified that, after he heard gunshots in Mary's apartment, Alexander came outside and said of his first gunshot wound, "George, it hurts." Alexander walked about ten feet from the door before falling on his face. Boyston followed him outside and, saying "I might as well finish you right now," fired two shots into Alexander's back.

¶80    The medical examiner, Dr. Vladimir Shvarts, testified that Alexander had three through-and-through gunshot wounds: two in the back that exited through the chest, and one through the arm near the elbow. Each of the gunshot wounds was in an area where there were pain receptors. Detective Olson, an expert in bloodstain patterns, testified that blood drops found inside the apartment and leading to bloodstains outside were "consistent with [Alexander] dropping the blood from his right arm."

¶81    The jury could reasonably find that Boyston shot Alexander in the arm at close range inside the apartment and that Alexander suffered significant physical pain from that wound. *See State v. Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993) (finding victim endured physical pain when he lay on the ground with a gash in his head for at least eighteen seconds and possibly as long as two to three minutes before being killed). The jury could also reasonably conclude that Boyston

38

knew or should have known that he had caused such pain, as he followed the wounded and staggering victim outside, where he shot him twice more in the back.[8]  Thus, the jury did not abuse its discretion in finding the (F)(6) aggravator established for the murder of Alexander.

### c.    Murder of Timothy

¶82    Witnesses described Boyston coming out of Mary's apartment fighting with Timothy, then pulling out a knife and stabbing him several times.  Two witnesses testified that they heard Timothy yelling for help.

¶83    Dr. Shvarts testified that Timothy received nine stab wounds and several abrasions in various parts of the body, each of which would have caused pain.  Three stab wounds to Timothy's chin and neck were non-fatal, as were two to the upper back.  Four stab wounds were to the chest, one of which was fatal.  The fatal wound was almost 3.5 inches deep and penetrated the pericardium and the heart.  Dr. Shvarts testified that the wound likely would have been fatal within a few seconds to minutes, but could possibly have taken up to twenty minutes to cause Timothy's death, depending on how quickly he lost blood.  Dr.

---

[8]    Boyston's argument that the state must present evidence that the defendant actually knew the victims would suffer pain misstates the law, as the state must prove merely that the defendant "knew *or should have known* that the victim would suffer."  *McCray*, 218 Ariz. at 259 ¶¶ 31, 33, 183 P.2d at 510 (emphasis added).

Shvarts could not opine how long it would have taken Timothy to become unconscious. But Timothy's hands were covered with blood, which, as Dr. Shvarts testified, indicated he likely used his hands to try to stop the bleeding.

¶84 From the evidence, the jury could reasonably conclude that Timothy suffered physical pain while being stabbed to death and that Boyston knew or should have known of that. Timothy "had ample opportunity not only to feel pain, but also to contemplate his impending death." *State v. Kuhs*, 223 Ariz. 376, 388 ¶ 62, 224 P.3d 192, 204 (2010). Indeed, Timothy's cries for help and his attempts to stop his own bleeding show that he was not only experiencing physical pain, but also mental anguish. *See id.* (concluding that the jury did not abuse its discretion in finding especial cruelty when the victim was stabbed twenty-one times and died by bleeding to death while choking on his blood). Thus, the jury did not abuse its discretion in finding the (F)(6) aggravator established for Timothy's murder.

**D. Mitigation**

¶85 Boyston alleged thirty-four mitigating circumstances, including diminished mental capacity, troubled family background, PCP intoxication, love and support of his family, impact of execution on his family, and remorse. The State presented evidence to rebut many of those mitigating factors. The jury did not find the proffered mitigation sufficiently

40

substantial to call for leniency. *See* A.R.S. § 13-751(C), (E).

**E.     Evaluating penalty phase for abuse of discretion**

**¶86**        We will overturn a jury's imposition of a death sentence only if "no reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Cota*, 229 Ariz. at 153 ¶ 95, 272 P.3d at 1044 (quoting *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220) (internal quotation marks omitted).  In the context of independent review, we have said that "[t]he (F)(8) multiple homicides aggravator is extraordinarily weighty." *State v. Hampton*, 213 Ariz. 167, 184 ¶ 81, 140 P.3d 950, 967 (2006).  In light of that aggravator as well as the (F)(2) and (F)(6) findings, even if we assume Boyston proved each of his alleged mitigating circumstances, the jury did not abuse its discretion in finding the mitigation insufficient to warrant leniency. *See* A.R.S. § 13-751(C).

**IV.   CONCLUSION**

**¶87**        We affirm Boyston's convictions and sentences.[9]

_____
                 John Pelander, Justice

_____

[9]    Boyston also raised in an appendix to his opening brief twenty-four claims to avoid federal preclusion.  We do not address those here.

41

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Scott Bales, Vice Chief Justice


_____
Robert M. Brutinel, Justice


_____
Diane M. Johnsen, Judge[*]

---

[*]  Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Diane M. Johnsen, Vice Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.